2008-NMSC-048

191 P.3d 521

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Martin SAIZ, Defendant–Appellant.**

**No. 29,386.**

Supreme Court of New Mexico.

July 22, 2008.

Albright Law & Consulting, Jennifer Rebecca Albright, Albuquerque, NM, for Appellant.

Gary K. King, Attorney General, Andrew S. Montgomery, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

DANIELS, Justice.

{1} Defendant Martin Saiz was convicted of first-degree murder, first-degree kidnapping, and tampering with evidence in connection with the killing of Carolyn Rustvold, an occupational therapist at Montezuma Elementary School in Albuquerque. We address Defendant's numerous claims of error and determine that (1) his wallet was lawfully searched without a warrant after his lawful arrest; (2) his convictions for both kidnapping and deliberate first-degree murder did not constitute double jeopardy; (3) double jeopardy considerations require reducing the number of separate convictions for tampering with evidence from nine to three; (4) the trial court did not err either in refusing to permit a defense witness to take the stand solely to invoke his self-incrimination privilege before the jury or in declining to order immunity for the witness; (5) the trial court did not abuse its discretion in determining which photographs of the victim's body should be admitted; (6) none of Defendant's claims of reversible error in the jury instructions are meritorious; (7) the record in this direct appeal does not support a claim of ineffective assistance of counsel; and (8) there is no cumulative error.

## I. BACKGROUND

{2} There were no known eyewitnesses to the assault and murder of Carolyn Rustvold other than herself and her killer, but the State presented a great deal of circumstantial evidence pointing clearly to Defendant and his crimes over the course of his fifteen-day jury trial.

{3} Rustvold was working late on a Friday afternoon after most people had left the grounds of Montezuma Elementary School for a three-day holiday weekend. At around 5:00 p.m., she approached a coworker to ask for help in getting into her portable classroom (building "P–17") after she had accidentally locked her keys inside. The coworker spotted Defendant, who was the only night custodian, down the hall. Knowing that he would be the only person on the premises who would have a key to P–17, she called out to him to help Rustvold. Rustvold rushed down the hall toward Defendant before the coworker lost sight of her.

{4} Rustvold was never seen alive again by any known witness. When she failed to come home that evening, her family went to the school to look for her, finding only her car at the deserted school grounds. They called the police and school personnel for help, and a search of her classroom disclosed clear signs of a violent and very bloody struggle between Rustvold and Defendant. The classroom clock had been unplugged and was stopped at 8:00 p.m. A great deal of evidence of an extensive but unsuccessful cleanup of the scene by Defendant, using school janitorial equipment and supplies, was found throughout the classroom, in the dumpster, in the custodian's closet, and at numerous other locations around the school. Evidence at the scene also indicated that Defendant had placed Rustvold or her body in the trunk of his car and had driven away from the scene after trying to wash away blood from his parking spot. A massive amount of scientific and other evidence developed during the course of the investigation, including DNA comparisons, fingerprint comparisons, blood analyses, hair analyses, clothing analyses, palmprint comparisons, shoeprint comparisons, tireprint comparisons, soil and fiber analyses, examinations of Defendant's car, examinations of Carolyn Rustvold's body after it was ultimately found, and mutual injuries of the two, confirmed both the violent struggle between them and the attempted coverup that was already obvious to the police before Defendant was arrested the next day.

{5} Despite the fact that Defendant's normally minimal duties as the only night custodian included vacuuming, emptying trash cans, and doing other routine cleaning, he never got around to completing those tasks that night. He clocked out of the school at approximately 11:07 p.m., after he normally would have completed all his assigned duties, but he never showed up that night at his home in Los Lunas, where he lived with his parents, or at his girlfriend's house, where he was expected to drop by that night after getting off work. No one in his family was able to find him until almost noon the next day, when they spotted him at a gas station. They told him the police wanted to come by his house to talk to him about the missing teacher.

{6} When Defendant arrived at his home in Los Lunas shortly after he found out that the police were looking for him, he was dirty and dusty. He explained to his brother that he had gotten his car stuck in the sand. Before the police arrived, he removed his clothes, showered and borrowed a change of clothes from his brother. He tried to clean and hide bloody items of clothing that contained both his and Rustvold's blood. When the police arrived at his house, they noticed that he still had sand in his ears and that large amounts of sand were in and under the car, extending up into the suspension and undercarriage. His wet shoes were in the bathtub with sand and blood still detectible in them.

{7} The officers arrested Defendant and transported him to Albuquerque. A wallet and lighter were taken from him during the search incident to his arrest, and an ATM receipt found in the wallet reflected that he had made a cash withdrawal in Belen before noon that day.

{8} An intensive search for Rustvold was unsuccessful until a railroad worker found her body in a Belen irrigation ditch two months later. Her body reflected that she had received numerous serious injuries. Her nose was broken and her face and head were lacerated in at least fifteen places by multiple blows with a blunt object. The battering caused a variety of simple, compound, complex, and intertwining fractures to various

locations on her skull, including linear fractures, comminuted fractures, depressed fractures, and a hinge fracture. Although the body was too badly decomposed to determine scientifically whether a sexual assault had taken place, her underpants appeared to have been removed and replaced on her body inside out. Her pants, shoes and socks had been removed and were missing. The body had been wrapped in plastic trash bags matching those used by Montezuma janitors and had been secured by duct tape matching rolls that had been found at the school during the investigation.

{9} The deep sand along the ditch where Rustvold's body was found matched the sand that had been found on Defendant's clothing and car. A Belen resident whose picture had been captured standing alongside Defendant by the ATM camera when Defendant made his withdrawal the day after the killing eventually admitted that he had gone to the ATM with Defendant while Defendant made a withdrawal. The cash was to pay the witness and two other men for helping Defendant get his stuck car out of the ditchbank sand that morning near where the body had been found.

{10} Defendant was indicted on one count of first-degree murder by willful and deliberate murder, contrary to NMSA 1978, Section 30–2–1(A)(1) (1994), or in the alternative by felony murder, contrary to Section 30–2–1(A)(2); one count of first-degree kidnapping (victim not freed in safe place and great bodily harm inflicted), contrary to NMSA 1978, Section 30–4–1 (1995, prior to 2003 amendment); 17 counts of tampering with evidence, contrary to NMSA 1978, Section 30–22–5 (1963, prior to 2003 amendment); and one count of larceny, contrary to NMSA 1978, Section 30–16–1 (1987). The jury returned verdicts of guilty as to both willful and deliberate murder and felony murder, first-degree kidnapping, and thirteen counts (subsequently reduced by the sentencing court to nine counts) of tampering with evidence. Defendant was sentenced to life imprisonment for one conviction of first-degree murder, 24 years for kidnapping, and 18 years for tampering with evidence, for a total penitentiary sentence of life plus 42 years.

He comes before this Court on direct appeal from those convictions.

## II. DISCUSSION

### A. Arrest, Search and Seizure Issues

{11} Defendant raises several search and seizure issues regarding the admissibility of the ATM receipt found in his wallet after he was arrested and the fruits of the investigation that resulted from discovery of the receipt. He argues first that his initial arrest was unlawful because insufficient exigent circumstances existed to justify his warrantless arrest. He also argues that the police should have obtained a search warrant to examine the contents of his wallet after it was removed from his possession in connection with his arrest.

### 1. Standard of Review

{12} A ruling on a motion to suppress evidence presents a mixed question of law and fact. *State v. Garcia*, 2005–NMSC–017, ¶ 27, 138 N.M. 1, 116 P.3d 72. We first review findings of fact by a substantial evidence standard. We then review whether the district court correctly applied the law to the facts by a de novo standard, viewing the facts in the light most favorable to the prevailing party. *Id.*

### 2. Defendant's Warrantless Arrest Was Justified by Exigent Circumstances

{13} All warrantless arrests must comply with Article II, Section 10 of the New Mexico Constitution, which states in relevant part that " '[t]he people shall be secure ... from unreasonable searches and seizures....' " *Campos v. State*, 117 N.M. 155, 157, 870 P.2d 117, 119 (1994) (quoting N.M. Const. art. II, § 10) (alterations in original). This Court has previously stated that "in all cases the ultimate question is whether the search and seizure was reasonable." *State v. Martinez*, 94 N.M. 436, 440, 612 P.2d 228, 232 (1980). "[F]or a warrantless arrest to be reasonable the arresting officer must show that the officer had probable cause to believe that the person arrested had committed or was about to commit a felony and some exigency existed that pre-

cluded the officer from securing a warrant." *Campos,* 117 N.M. at 159, 870 P.2d at 121. " 'Probable cause requires that the officer believe, and have good reason to believe, that the person he arrests has committed [or is committing] a felony.' " *Id.* at 157, 870 P.2d at 158 (quoted authority omitted). "Exigent circumstances means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *Id.* at 158, 870 P.2d at 120 (quoted authority omitted). This requires a determination whether "on the basis of the facts known to a prudent, cautious, trained officer, the officer could reasonably conclude that swift action was necessary." *State v. Valdez,* 111 N.M. 438, 441, 806 P.2d 578, 581 (Ct.App.1990) (quoted authority omitted).

{14} We first consider whether the district court was correct in ruling that the police had probable cause to arrest Defendant. By the time the police finally located Defendant the day after both he and Rustvold were last seen together at Montezuma Elementary School, the evidence pointed overwhelmingly to his having assaulted her and removed her from the school premises in his own car. When the officers encountered Defendant, they did not know where she was, and they could not be sure whether she was dead or alive. It was clear, however, that Defendant had already removed her from the school, that he had been eluding detection and that he had been aggressively destroying and concealing evidence of his crimes. The district court's extensive findings of fact from the suppression hearing detailed many of the sound reasons why the officers were justified in believing that swift action was necessary to prevent Defendant's escape, to keep further evidence from being destroyed and to pursue any remaining possibility of saving Rustvold's life.

▮ {15} The fact that the police took two hours after Defendant's arrest to obtain search warrants for Defendant's car and home is relied on by Defendant as proof that exigent circumstances did not exist for his arrest. The police also might have risked waiting to get an arrest warrant before apprehending Defendant, but "[t]he fact that a different course of action also would have been reasonable does not mean that [an officer's] conduct was unreasonable." *State v. Gomez,* 1997–NMSC–006, ¶ 43, 122 N.M. 777, 932 P.2d 1. The exigent circumstances exception to the warrant requirement necessarily provides a range of reasonable discretion to an officer on the scene. If "an objectively reasonable, well-trained officer *could* have determined that swift action was called for to prevent destruction of evidence, the escape of a suspect or undue risk to life or property," the exigent circumstances exception will protect the officer's exercise of discretion. *State v. Rowell,* 2008–NMSC–041, ¶ 30, 144 N.M. 371, 188 P.3d 95 (emphasis added). We therefore uphold the district court's reasoned determination that the warrantless arrest of Defendant was lawfully supported by both probable cause and exigent circumstances.

### 3. The Warrantless Post–Arrest Search of Defendant's Wallet Was Lawful

▮ {16} In addition to Defendant's argument that the seizure and subsequent search of his wallet were tainted fruits of an initially unlawful warrantless arrest, he contends that the post-arrest search of the contents of his wallet without a search warrant was unlawful.

{17} One of the most universally recognized exceptions to the warrant requirement is for searches and seizures incident to a custodial arrest, which permits the search of an arrestee's person and any other area within the arrestee's access. *See State v. Weidner,* 2007–NMCA–063, ¶ 18, 141 N.M. 582, 158 P.3d 1025.

{18} Defendant was carrying his wallet in his pocket when he was taken into custody at his house. The search of his person and the seizure of the wallet were incident to his lawful arrest.

▮ {19} A second exception permits inventory searches of property taken into police custody, such as Defendant's wallet. *State v. Boswell,* 111 N.M. 240, 241–42, 804 P.2d 1059, 1060–61 (1991). In *Boswell,* this Court addressed a factually indistinguishable situation. The defendant had been arrested

for shoplifting and was taken to a detention facility, where he was booked and incarcerated. *Id.* at 241, 804 P.2d at 1060. The officer then returned to the scene of the arrest to retrieve the defendant's wallet, which inadvertently had been left behind in the store manager's office after the officer had conducted a search incident to the arrest. *Id.* When the officer searched the wallet, he found a blotter of LSD. *Id.* This Court declined to suppress the LSD evidence, holding that the inventory search exception justified the search of the wallet that the officer had validly taken into police possession incident to the defendant's arrest. *Id.* An inventory search does not depend on any reason to believe that there is seizable property to be found because the purposes that justify an inventory search are "to safeguard the property from loss or theft, to protect the police from liability and false claims, and to protect the police from hidden dangers." *Id.* at 244, 804 P.2d at 1063.

{20} At the suppression hearing below, the State presented uncontroverted evidence that Albuquerque Police Department written policies required police to inventory every item taken from persons in custody. Under our law, the officer's subjective motives do not avoid application of the inventory search exception where it is lawfully justified. Therefore, we reject Defendant's argument that the detective's search of his wallet was unlawful because it was not motivated by a desire to conduct an inventory. Where "an inventory search of Defendant's belongings was inevitable," the inevitable discovery rule would preclude suppression of the officer's search of the items taken from an arrestee. *See State v. Johnson*, 1996–NMCA–117, ¶ 22, 122 N.M. 713, 930 P.2d 1165.

{21} Once the officer saw the receipt in the wallet reflecting Defendant's presence in Belen at an ATM with a potential photographic record of a recent transaction between the time of Rustvold's disappearance and Defendant's surfacing without her, "swift action was necessary." *State v. Moore*, 2008–NMCA–056, ¶ 10, 144 N.M. 14, 183 P.3d 158 (quoted authority omitted). The officer had compelling reasons to investigate the transaction immediately, both in investigating the murder case and in attempting to determine Rustvold's fate and whereabouts. Time was of the essence. The fruits of that investigation, including the ATM photograph of one of the men who had helped Defendant get his car unstuck from the sand where he had driven to dump Rustvold's body, were therefore properly developed and properly admissible in evidence.

**B. Double Jeopardy Issues—Kidnapping and Tampering Convictions**

*1. Standard of Review*

{22} The United States and the New Mexico Constitutions both guarantee that no person shall "be twice put in jeopardy" of punishment for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. The federal protection is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Because Defendant does not argue that New Mexico double jeopardy protection should be interpreted any differently from that of the United States, we evaluate his claims under federal double jeopardy principles. *See State v. Reyes*, 2002–NMSC–024, ¶ 10 & n. 2, 132 N.M. 576, 52 P.3d 948. Double jeopardy presents a question of law, which we review de novo. *State v. Bernal*, 2006–NMSC–050, ¶ 6, 140 N.M. 644, 146 P.3d 289.

{23} Among other protections, the Double Jeopardy Clause protects a person from being punished more than once for the same offense ("multiple punishments"). *State v. Frazier*, 2007–NMSC–032, ¶ 13, 142 N.M. 120, 164 P.3d 1. Multiple punishments may involve two types of issues, both of which we address here. The first issue, which we analyze with respect to the sentences for murder and kidnapping, is whether this is a "double-description" case in which Defendant is being punished for violating multiple statutes that should be " 'deemed the same offense for double jeopardy purposes.' " *Id.* (quoting *Swafford v. State*, 112 N.M. 3, 8, 810 P.2d 1223, 1228 (1991)). The second issue, which we address with respect to the tampering convictions, involves a

"unit-of-prosecution" analysis, where we examine whether Defendant has been improperly punished for " 'multiple violations of a single statute based on a single course of conduct.' " *Id.* (quoting *Swafford,* 112 N.M. at 8, 810 P.2d at 1228).

### 2. Double–Description: First–Degree Murder and First–Degree Kidnapping

{24} Defendant was indicted for two alternative forms of first-degree murder, willful and deliberate murder and a murder committed in the commission of a dangerous felony ("felony murder"). The jury was given separate jury verdict forms for each of those theories instead of a single first-degree murder general verdict form and was instructed that the two theories were alternative ways in which a guilty verdict for first-degree murder could be returned. The trial court properly instructed the jury that one of the essential elements of the felony murder charge was that Defendant committed the felony of first-degree kidnapping. The jury was properly instructed on the elements of first-degree kidnapping and was given a separate verdict form for the kidnapping charge.

{25} Instead of selecting only one of the alternative murder theories, the jury returned guilty verdicts for both willful and deliberate murder and felony murder. Both theories of first-degree murder were wholly consistent with the evidence and justified by the reality that a person is capable in fact and in law of willfully and deliberately committing first-degree murder during the commission of a felony. *See State v. Fry,* 2006–NMSC–001, ¶ 18, 138 N.M. 700, 126 P.3d 516 ("[F]irst degree murder is a single crime, whether supported by a single theory or by multiple theories . . . ."). The jury also found Defendant guilty of first-degree kidnapping, which had been the predicate offense of the alternative felony murder verdict.

{26} The district court sentenced Defendant for one count of kidnapping and one count of first-degree murder. Under New Mexico precedent, it would have been a violation of double jeopardy to impose more than one homicide conviction for one death. *See State v. Santillanes,* 2001–NMSC–018, ¶ 5, 130 N.M. 464, 27 P.3d 456. When faced with jury verdicts for two separate murder theories as to the same killing, we have held that one general judgment of conviction for first-degree murder should be entered, as was done here. *Reyes,* 2002–NMSC–024, ¶ 18. The court also sentenced Defendant on his separate conviction of first-degree kidnapping.

{27} Defendant argues that punishing him for both kidnapping and murder under the circumstances of this case constitutes a double-description form of double jeopardy violation. Where a defendant alleges that he has been punished for violation of two or more statutes for the same conduct, we must determine whether the Legislature intended to authorize multiple punishments for the separate statutory violations. *Frazier,* 2007–NMSC–032, ¶ 18.

{28} *Swafford* guides our analysis on this issue. That case held that a defendant's punishment for both incest and criminal sexual penetration arising out of the same conduct constituted double jeopardy, and the opinion articulated a "two-part test for determining legislative intent to punish." *Swafford,* 112 N.M. at 13, 810 P.2d at 1233. *Swafford's* threshold inquiry is:

[W]hether the conduct underlying the offenses is unitary, *i.e.,* whether the same conduct violates both statutes, which in most cases leads to a judicial inquiry into the facts and circumstances of the case to determine whether acts associated with each statute are sufficiently separated by time and space to allow for separate prosecution and conviction under each statute.

*Frazier,* 2007–NMSC–032, ¶ 15 (quoting *Swafford,* 112 N.M. at 13–14, 810 P.2d at 1233–34). If the acts are sufficiently separated, there is no multiple punishment concern, and therefore there is no need to proceed to the next part, which would be to determine whether the Legislature intended to create separately punishable offenses through two different statutes addressing the same unitary conduct. *Id.* ¶ 18.

{29} We clarify that the challenge here does not address convictions for both felony murder and its predicate felony of kidnapping. If that were the case, we would be

compelled to reverse the kidnapping conviction. *See State v. Gonzales*, 2007–NMSC–059, ¶ 12, 143 N.M. 25, 172 P.3d 162 (holding that reversal of the predicate felony conviction was necessary where the general verdict of murder returned by the jury did not indicate whether the first-degree murder conviction was based on a willful and deliberate or a felony murder theory). In this case, we do not have a *Gonzales* situation where we cannot be certain the jury intended to convict for willful and deliberate murder. The jury specifically found Defendant guilty of both forms of first-degree murder, although the district court correctly imposed only one murder conviction and sentence, to avoid the double jeopardy violation that would have resulted from punishing Defendant for both felony murder and willful and deliberate murder. With the guidance of the jury's verdicts on both alternative theories instead of only one, the court also was able to avoid the double jeopardy violation that would have resulted from punishing Defendant for both felony murder and its incorporated predicate offense of first-degree kidnapping. The jury's return of verdicts on both alternative theories, even though only one punishment can be imposed, is actually a preferable procedure that serves to ensure just punishment without creating unnecessary double jeopardy issues. We therefore need analyze only one double jeopardy issue, whether Defendant's convictions for both first-degree kidnapping and willful and deliberate first-degree murder result in multiple punishments for the same offense.

**▮▮▮▮** {30} The essence of Defendant's argument is that the acts constituting the kidnapping were not sufficiently distinct from the acts constituting the murder for two separate crimes to have been committed. This requires an examination of the trial record to determine whether the evidence shows that Defendant committed the acts constituting the crime of kidnapping, in addition to committing separate acts constituting first-degree murder. Under *Swafford*, we look to whether a defendant's acts are separated by "sufficient indicia of distinctness" to be considered non-unitary conduct. *State v. Contreras*, 2007–NMCA–045, ¶ 21, 141 N.M. 434, 156 P.3d 725 (quoted authority omitted).

Distinctness may be established by determining whether the acts constituting the two offenses are sufficiently separated by time or space, looking to the quality and nature of the acts, the objects and results involved, and the defendant's *mens rea* and goals during each act. *See Swafford*, 112 N.M. at 13–14, 810 P.2d at 1233–34; *State v. Franco*, 2005–NMSC–013, ¶ 7, 137 N.M. 447, 112 P.3d 1104. " 'The proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses.' " *Contreras*, 2007–NMCA–045, ¶ 21 (quoting *Franco*, 2005–NMSC–013, ¶ 7).

{31} To find Defendant guilty of willful and deliberate murder, the jury was required to find beyond a reasonable doubt that he killed the victim with the deliberate intention to take her life. In doing so, they were called upon to evaluate a great deal of circumstantial evidence, including the sustained deadly attack by Defendant, using his hands and other weapons, including a bloody screwdriver and possibly some bloody wooden blocks found at the school. *See Reyes*, 2002–NMSC–024, ¶ 15 (citing *State v. Rojo*, 1999–NMSC–001, ¶ 24, 126 N.M. 438, 971 P.2d 829, for the proposition that "evidence of the method used to kill the victim, ... when combined with circumstantial evidence and reasonable inference arising from the surrounding circumstances, was sufficient to prove the requisite intent to kill"). The multiple and varied wounds inflicted on Rustvold, the sustained brutality of Defendant's attack, and the multiple weapons all confirm that the jury was justified in concluding that Defendant intended to kill his victim to keep her from reporting him to the authorities, and that he intended to do what it took to keep her from leaving P–17 alive. Significantly, Defendant does not challenge the sufficiency of the evidence to support his conviction for willful and deliberate murder.

{32} The evidence also provided a sufficient basis for the jury's finding that Defendant committed the separate crime of kidnapping by, in the terms of the jury instructions, taking, restraining, confining or restraining the victim by force, intimidation or deception with the intent to hold her

against her will to inflict death, physical injury or a sexual offense. *See* UJI 14–403 NMRA 2007.

{33} The district court made specific and well-supported findings supporting the conclusions that Defendant's initial motive in restraining the victim was for the purpose of a sexual assault. The record included evidence that (1) the victim, who had been a volunteer rape crisis counselor, had made it clear to those who knew her that she would use every means to resist a sexual assault, (2) Defendant had been seen acting suspiciously around her classroom on more than one occasion, (3) all of the victim's lower clothing had been removed, (4) her underpants had been placed back on her body but were inside out, (5) her brassiere was torn and one breast was exposed, (6) she had inflicted defensive scratches on Defendant's hands and arms, and (7) blood smears in the classroom indicated that the victim had struggled while being held to the floor during the course of the events. After Defendant killed her, he replaced part, but not all, of her lower clothing before wrapping her body for disposal in a place where he hoped it could not be found.

{34} Looking at the totality of the evidence related to the two separate crimes, it was altogether reasonable for the jury to conclude that Defendant had first restrained Rustvold for the purpose of sexually assaulting her and had made a number of efforts to accomplish that result. The evidence also provided ample support for a finding that he deliberately intended to make sure she was never going to leave the classroom alive after his sexual assault. Under those circumstances, there was substantial evidence supporting the jury's finding of two separate crimes of kidnapping and murder. *See State v. McGuire*, 110 N.M. 304, 309, 795 P.2d 996, 1001 (1990) (concluding that once the defendant had confined the victim with the requisite intent to hold the victim for service against her will, "he had committed the crime of kidnapping, although the kidnapping continued throughout the course of defendant's other crimes and until the time of the victim's death"); *State v. Allen*, 2000–NMSC–002, ¶¶ 67–70, 128 N.M. 482, 994 P.2d 728 (holding that evidence supported finding of separate kidnapping where the defendant restrained victim before strangling her with a rope); *State v. Jacobs*, 2000–NMSC–026, ¶ 25, 129 N.M. 448, 10 P.3d 127 (holding that evidence supported separate conviction of kidnapping where the defendant either restrained victim for purposes of sexual assault or restrained her during a 100–yard walk before he killed her).

{35} While it is not necessary to reach *Swafford's* legislative intent test unless Defendant's conduct has been determined to be unitary, Defendant's separate convictions would have to be upheld under that test, as well. Restraining for the purpose of sexual assault is not an element of willful and deliberate first-degree murder and killing is not an element of kidnapping. "When the elements of the statutes are not subsumed within the other, there is a presumption the statutes punish distinct offenses." *State v. Sanchez*, 2000–NMSC–021, ¶ 33, 129 N.M. 284, 6 P.3d 486.

### 3. Unit of Prosecution: Multiple Tampering Convictions

{36} Defendant was indicted on 17 separate counts of tampering with evidence for his extensive efforts to conceal his crime. Prior to trial, he moved the district court to merge those 17 counts into two counts on double jeopardy grounds, one count for the disposal of the victim's body and the second for all remaining acts of evidence tampering. The district court deferred ruling on the merger motion until after the jury verdict. Two counts were dismissed by directed verdict and another two resulted in verdicts of not guilty. Thirteen counts resulted in guilty verdicts. Prior to sentencing, the court ruled that four of the 13 counts did not bear sufficient indicia of distinctness from other counts to be considered separately punishable crimes. The court ultimately sentenced Defendant to consecutive aggravated prison sentences on the nine remaining tampering counts: (1) cleaning blood from various surfaces in classroom P–17; (2) placing bloody items from P–17 in a trash dumpster 100 feet away; (3) painting over blood evidence on wooden blocks in P–17; (4) cleaning blood

from building P–51; (5) cleaning blood from classroom K–1; (6) cleaning blood between school buildings K–1 through K–3; (7) hiding bloody items in trash bags in the janitor's closet; (8) hiding and cleaning his clothing at his home the next day; and (9) removing and disposing of Rustvold's body.

{37} Defendant argues on appeal that eight of the nine counts—all but the disposal of the victim's body—were based on a continuous course of conduct with a single *mens rea* and should be considered only one crime instead of eight in order to avoid multiple punishments for the same offense in violation of the double jeopardy clause.

{38} The guidelines for our resolution are set forth in *State v. DeGraff*, 2006–NMSC–011, ¶ 34, 139 N.M. 211, 131 P.3d 61. Given the absence of any clear indication that the Legislature intended to punish Defendant separately for every item of evidence tampered with, Section 30–22–5, this Court will presume that the Legislature did not intend to impose multiple punishments for each step in a single continuous criminal action. *DeGraff*, 2006–NMSC–011, ¶ 34.

{39} Because the tampering statute does not clearly define the intended unit of prosecution, the Court must consider whether Defendant's actions are separated by sufficient "indicia of distinctness." *Id.* ¶ 35. "Such indicia include the timing, location, and sequencing of the acts, the existence of an intervening event, the defendant's intent as evidenced by his conduct and utterances, and the number of victims." *Id.* (citing *Herron v. State*, 111 N.M. 357, 361, 805 P.2d 624, 628 (1991)).

{40} In *DeGraff*, the defendant was found guilty of five counts of tampering with evidence for throwing three separate weapons out of his car window, abandoning his car and hiding his clothes upon returning home. *Id.* ¶ 32. The defendant contended that his acts constituted one count of tampering and the State argued that it constituted five counts. *Id.* ¶¶ 36, 38. Applying an indicia of distinctness analysis, we held that the defendant had committed three discrete crimes of tampering. *Id.* ¶ 36. We reasoned that the defendant hid the evidence at three different times in three different locations by throwing

the weapons out of the car, later abandoning the car and then hiding his clothes the next day. *Id.* ¶ 37. While throwing the three weapons out of the car certainly were three physical acts, those acts were simply components of one continuous crime of disposing of the weapons. *Id.* ¶ 39.

{41} We reach a similar result here. While Defendant performed dozens of individual physical acts in disposing of and altering a great number of evidentiary items, there were really only three conceptually separate crimes of tampering in this case, just as there were in *DeGraff*. The first occurred at the school immediately after the murder, where Defendant engaged in a massive attempt to clean up the evidence at the crime scene. The second occurred when he took Rustvold's body from Albuquerque to Belen and disposed of it in an irrigation ditch. The third occurred the day after the murder, when he attempted to destroy and conceal evidence at his home.

{42} To impose nine sentences for three separately punishable crimes would constitute multiple punishments for the same offense. On remand, the nine tampering convictions should therefore be consolidated to three, and the six remaining tampering convictions and sentences should be vacated.

## C. Refusal to Permit Testimony of Defense Witness J.G.

{43} A juvenile friend of Defendant made varying pretrial statements to police, including that on the evening Rustvold disappeared, he and his brother had been at the school with Defendant helping him with his cleaning tasks, without seeing anything unusual. Defendant attempted to call J.G. as a defense witness at trial to testify to this account. Before trial, J.G. retained counsel, who advised him to assert his self-incrimination privilege.

{44} The trial court held a hearing out of the presence of the jury to determine whether J.G. should be brought before the jury to testify under those circumstances. After determining that J.G. was going to follow the advice of his attorney and invoke his self-incrimination privilege on every issue but his

name, the trial court ruled that he could not take the stand to do so before the jury. Defendant argues on appeal that it was error for the trial court to refuse to allow J.G. to invoke his privilege before the jury, and that it was also error for the trial court not to grant immunity to J.G. to override his assertion of privilege. We reject both arguments.

{45} The question of allowing J.G. to exercise his privilege in the presence of the jury merits little discussion. The law clearly rejects Defendant's request that the defense witness should have been called before the jury to assert his privilege against self-incrimination for the purpose of having the jury draw inferences from his silence.

{46} Rule 11–513 NMRA of the New Mexico Rules of Evidence specifically addresses every aspect of this issue. Section A provides that a claim of privilege is not a proper subject of comment by counsel and no inference can be drawn from the claim. Section C provides that if the jury somehow becomes aware of the assertion of a privilege, a party is specifically entitled to an instruction that no inference can be drawn as a result. The claim of privilege by J.G. was therefore irrelevant to any issue in the case. Section B provides a prophylactic mechanism for avoiding the need for a cautionary instruction by requiring that any such claims should be made "without the knowledge of the jury." The court therefore was correct in determining outside the presence of the jury that J.G. would exercise his privilege.

{47} The case law of New Mexico also has been clear that it is improper for a party to place a witness on the stand for the purpose of invoking the privilege against self-incrimination. *See, e.g., State v. Henderson,* 2006–NMCA–059, ¶ 26, 139 N.M. 595, 136 P.3d 1005 (reviewing New Mexico cases on the subject).

{48} On appeal, Defendant adds a twist to the argument presented to the trial judge by arguing that the district court should have granted immunity to J.G. so he could have testified without a self-incrimination problem. This argument is also meritless. Defendant made no record below of making a colorable request for an immunity grant. Even if he

had, the law of this State would not have supported such a request, as he candidly concedes.

{49} Rule 5–116 of the New Mexico Rules of Criminal Procedure provides the only mechanism for granting immunity to overcome a person's assertion of a self-incrimination privilege. The rule specifically limits the power of the district court to situations where there has been a "written application of the prosecuting attorney" requesting the grant of immunity. Rule 5–116(A) NMRA. It is the prosecutor alone who may decide whether to give a person relief from prosecutorial use of his incriminating statements. There was no such request by the prosecuting attorney in this case.

{50} New Mexico case law is consistent on this point. *See State v. Brown,* 1998–NMSC–037, ¶ 64, 126 N.M. 338, 969 P.2d 313 ("[Rule 5–116] requires application of the prosecuting attorney."); *State v. Baca,* 1997–NMSC–045, ¶ 37, 124 N.M. 55, 946 P.2d 1066 (stating that there is no constitutional provision or statute which allows either the defense or the courts to confer immunity upon a defense witness); *State v. Cheadle,* 101 N.M. 282, 286, 681 P.2d 708, 712 (1983) (holding that there is no New Mexico authority to demand immunity for a defense witness); *State v. Belanger,* 2007–NMCA–143, ¶ 6, 142 N.M. 751, 170 P.3d 530 (reviewing New Mexico precedent rejecting defense witness immunity); *State v. Sanchez,* 98 N.M. 428, 435, 649 P.2d 496, 503 (Ct.App.1982) ("Except where coupled with a showing of prosecutorial misconduct, refusal of the prosecution to seek a grant of witness immunity for a defense witness or refusal of the trial court to fashion a remedy to extend use immunity to a defense witness, does not constitute a denial of due process to the defendant.").

{51} Defendant has not shown anything in the circumstances of this case that would cause us to consider overruling our precedents. His arguments that the witness did not have a good faith self-incrimination concern and that the State had no good faith interest in preserving its option to use J.G.'s potential testimony against him in a future prosecution are demonstrably unfounded. In his pretrial statements, J.G. had given incon-

sistent stories concerning whether he had been at the school with Defendant on the evening in question. If he testified at trial that he had been at the school, that testimony, combined with the overwhelming evidence that a bloody and violent killing and evidence cleanup had occurred at that time and place, could have exposed him to prosecution for involvement in some or all of Defendant's crimes. Any account he could have told the jury would also have been of little assistance to Defendant in avoiding conviction, given the overwhelming scientific and other circumstantial evidence tying Defendant in particular to the killing. At the most, J.G.'s testimony placing himself at the scene might have raised the possibility that Defendant had help from J.G. in the tampering cleanup, if not in the killing itself.

### D. Admission of Allegedly Prejudicial Photographs of the Victim's Body

■ {52} At trial, Defendant objected to the admission of nine photographs of the victim's decomposed body, arguing that the prejudicial impact of the gruesome photographs outweighed any probative value, given alternative ways of presenting the relevant information in the photos. The district court judge conducted a hearing out of the presence of the jury at which the State's pathologist discussed how each picture would assist him in explaining the injuries to the jury more accurately than by the use of diagrams or mere descriptive words. After discussions with the State about redacting several pictures to preclude the unnecessary showing of decomposition of the body, the judge eventually excluded four of the nine proffered photographs and allowed the remaining five to be admitted. We examine whether the probative value of the five photographs that were admitted was outweighed by their prejudicial impact.

■ {53} We review a trial court's exercise of discretion in admitting allegedly prejudicial photographs under an abuse of discretion standard. *State v. Garcia*, 2005–NMCA–042, ¶ 50, 137 N.M. 315, 110 P.3d 531 (upholding the admission of photographs of a victim after death to assist in showing the full nature of the injuries, to explain the

forensic pathologist's opinions, and to illustrate the pathologist's testimony).

■ {54} "A trial court has great discretion in balancing the prejudicial impact of a photograph against its probative value." *State v. Mora*, 1997–NMSC–060, ¶ 55, 124 N.M. 346, 950 P.2d 789; *see id.* (upholding admission of photographs of the body of a child homicide victim). In this case, the trial judge proceeded cautiously and prudently, both by considering the basis for his Rule 11–403 decision outside the presence of the jury and by carefully selecting a limited number of photographs to admit while excluding others. The court did not abuse its discretion in allowing the five photographs to be admitted into evidence.

### E. Claimed Jury Instruction Errors

{55} Defense counsel makes three challenges to the jury instructions pursuant to appointed counsel's obligations to make a good faith effort to present all contentions urged by a defendant. *See State v. Franklin*, 78 N.M. 127, 129, 428 P.2d 982, 984 (1967); *State v. Boyer*, 103 N.M. 655, 658, 712 P.2d 1, 4 (Ct.App.1985). We have examined the complaints and conclude that they lack merit.

### 1. Standard of Review

■ {56} We apply two different standards in reviewing claimed error in jury instructions. "If the error has been preserved we review the instructions for reversible error. If not, we review for fundamental error. Under both standards we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Benally*, 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citations omitted). We apply the reversible error standard to the only instructions challenged by Defendant in the trial court, those relating to accomplice liability. We review Defendant's remaining two jury instruction claims under the fundamental error standard.

### 2. Propriety of Instructing on Accessory Liability

{57} Defendant argues here, as he did below, that there was insufficient evidence to warrant submission of jury instructions on accessory liability and aiding and abetting theories. We start with the proposition that a trial court is warranted in providing the jury with accurate instructions of law on all theories of the case that are supported by substantial evidence. *See State v. Brown*, 1996–NMSC–073, ¶ 34, 122 N.M. 724, 931 P.2d 69. In this case, while it was the State's primary theory that Defendant acted alone in the murder, Defendant had elicited evidence at trial that one or more of his friends might have been with him at the school during the evening of the murder.

{58} The accessory liability instructions were therefore both justified and necessary. The evidence raising the question of whether Defendant's friends may have had some part in committing the various crimes made it important to avoid any confusion about Defendant's criminal liability for crimes that he may have committed in concert with others. The instructions correctly set forth the law imposing full criminal responsibility on accomplices to a crime, and Defendant's objections to the instructions were properly overruled.

{59} Defendant's remaining jury instruction claims were not preserved in the district court, and we therefore address those claims under a fundamental error standard of review. *See State v. Gonzalez*, 2005–NMCA–031, ¶ 19, 137 N.M. 107, 107 P.3d 547 (stating that when a defendant does not object to the jury instructions as given, an appellate court reviews that instruction for fundamental error); Rule 12–216 NMRA. Our fundamental error power is exercised only to correct injustices that shock the conscience of the court, a term that has been used in our precedents "both to describe cases with defendants who are indisputably innocent, and cases in which a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *State v. Barber*, 2004–NMSC–019, ¶ 17, 135 N.M. 621, 92 P.3d 633. We have an affirmative duty "to prevent a miscarriage of justice" in our review of fundamental error. *Reyes*, 2002–NMSC–024, ¶ 42 (quoted authority omitted). While we apply the fundamental error standard with regard to Defendant's remaining instruction claims and find no miscarriage of justice, we also observe that there would have been no reversible error under any standard of jury instruction review.

### 3. Adequacy of the Felony Murder Instruction

{60} Defendant's first unpreserved complaint is that the district court did not adequately instruct the jury in the felony murder instruction that the predicate felony, kidnapping, had to have been committed under inherently dangerous circumstances. There are several reasons why we must reject this contention, and we need address only the two simplest ones to demonstrate that there was neither harm nor foul in the instructions.

{61} The most obvious reason for finding no harm is that, despite the fact the jury found that Defendant committed the elements of felony murder in addition to those of willful and deliberate murder, his single conviction and sentence for first-degree murder was necessarily based on the latter alternative theory, as we previously discussed in Section II.B of this opinion. He was neither convicted nor sentenced for felony murder; therefore, there would be no felony murder conviction for us to reverse, even if there had been a fatal flaw in the felony murder instructions.

{62} The clearest reason for finding no foul is that the felony murder instruction did not contain reversible error. In *State v. Harrison*, we held that there were different ways in which the requirement of an inherently dangerous predicate felony for felony murder could be established. 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977), *superseded by rule on other grounds as stated in Tafoya v. Baca*, 103 N.M. 56, 60, 702 P.2d 1001, 1005 (1985). It can be established either by showing that the underlying felony was a first-degree felony, as was the first-degree kidnapping in this case, or by showing that the underlying felony was otherwise inherently

dangerous. *See Frazier*, 2007–NMSC–032, ¶ 8 ("In *Harrison*, we held that only a first-degree felony or an inherently dangerous felony committed under inherently dangerous circumstances could support a felony murder charge."). Even if the jury in this case had not been told that they had to find the kidnapping was done under inherently dangerous circumstances, it was sufficient that they were told they had to find Defendant had committed the killing in the commission of first-degree kidnapping and were given the required elements instructions for that offense. Because Defendant was charged with, received proper instructions concerning, and was found guilty of the first-degree predicate felony, first-degree kidnapping, the instructions would have been sufficient even if we had a conviction and sentence for felony murder before us.

### 4. Instructing on Both Felony Murder and Deliberate Murder

{63} Defendant's other unpreserved jury instruction claim is that the district court erred in instructing the jury on both felony murder and deliberate murder theories. The two theories are alternative in the sense that either will support a conviction for first-degree murder, but they are not mutually exclusive. *See Reyes*, 2002–NMSC–024, ¶ 14 ("On their face, the crimes of deliberate intent murder and felony murder are not inherently contradictory. In this case, the two crimes are not factually contradictory."). In this case, for reasons that have been amply discussed already, there was sufficient evidence to support both theories, and there was no error in supporting both for the jury's consideration. We therefore reject Defendant's challenges to the jury instructions.

### F. Ineffective Assistance of Counsel

{64} Defendant raises for the first time on appeal an argument that his trial counsel refused Defendant's request to testify on his own behalf and thereby provided ineffective assistance of counsel. There is no evidence in the record to support these contentions.

{65} A defendant must demonstrate error on the part of counsel and that such error resulted in prejudice in order to prove an ineffective assistance of counsel claim. *Bernal*, 2006–NMSC–050, ¶ 32 (citing *Strick-*

*land v. Washington*, 466 U.S. 668, 690, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). There is nothing before us in the record on direct appeal that would establish a prima facie case of ineffective assistance. "When such questions arise, further evidence is often required." *Bernal*, 2006–NMSC–050, ¶ 33. Defendant may pursue habeas corpus proceedings on this issue in the future if he is ever able to provide evidence to support his claims. *See State v. Martinez*, 1996–NMCA–109, ¶ 25, 122 N.M. 476, 927 P.2d 31.

### G. Cumulative Error

{66} Defendant's final argument is that all of the asserted errors cumulatively amounted to the denial of a fair trial. "The doctrine of cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Woodward*, 121 N.M. 1, 12, 908 P.2d 231, 242 (1995) (internal quotation marks and citations omitted). We have already addressed Defendant's multiple claims of every arguable denial of a fair trial in this record and have found no error that jeopardized Defendant's right to a fair trial, despite defense counsel's thorough efforts. The summary answer to this summary argument is that where there is no error to accumulate, there can be no cumulative error.

### III. CONCLUSION

{67} We affirm Defendant's convictions and sentences for one count of first-degree murder, one count of first-degree kidnapping, and three counts of tampering with evidence. We reverse his convictions for the remaining six counts of tampering with evidence, and we remand to the district court for entry of an amended judgment and sentence consistent with this Opinion.

{68} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, RICHARD C. BOSSON, Justices.