This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                         **NO. 34,473**

**SANTOS IGNACIO TORRES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Charles W. Brown, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Tonya Noonan Herring, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Judge.**

{1} Defendant Santos Torres appeals his convictions for second-degree murder, criminal sexual penetration (CSP), and two counts of tampering with evidence. He argues that there was insufficient evidence to support his murder and CSP convictions and that his convictions for two counts of tampering with evidence violate his constitutional right to be free from double jeopardy. We affirm Defendant's convictions.

**BACKGROUND**

{2} Early in the morning on January 24, 2012, Fred Chavez (Victim) was found unconscious and bleeding in the parking lot of an apartment complex in Albuquerque, New Mexico. Victim was taken to the University of New Mexico Hospital (UNMH), where he received trauma-level care for multiple injuries, including multiple head and facial fractures, traumatic brain injury, and emergency surgery to close a rectal tear. He remained in the Intensive Care Unit and was treated for a diffuse brain injury, but he never regained consciousness. Approximately four days after Victim was taken to UNMH, his family decided to remove him from life support after consulting with his neurosurgeons. Victim was pronounced dead just after midnight on January 29, 2012.

{3} Because of the nature of Victim's injuries, Albuquerque Police Department (APD) officers who responded to the call for service at the apartment complex immediately began a field investigation on January 24, 2012, to determine whether a

crime had been committed. An APD crime scene specialist processed the scene and documented and collected clothing worn by Victim, which was removed from his person by medical personnel prior to his transport to UNMH. She also looked for blood spatter on the walls near where Victim was located, which could have indicated that his injuries occurred in that location, but finding none, she looked for a blood trail. She located and documented a trail of blood drops that led from where Victim was found to the porch area in front of Defendant's apartment. She collected three samples of blood from the trail: one from the end of the trail where Victim was found, one from in front of Defendant's apartment, and one in between those points. DNA testing confirmed that the blood in the trail was Victim's.

{4} Defendant was tried for the aforementioned counts of conviction from which he appeals, and an additional count of tampering with evidence of which he was acquitted. At trial, three witnesses—Defendant's girlfriend, roommate, and cellmate—testified that Defendant confessed to them that he had beaten Victim. Defendant's roommate, Chris Carter, testified that Defendant also confessed to sexually assaulting Victim.

{5} The State called numerous expert witnesses, including Dr. Clarissa Krinsky, a forensic pathologist with the Office of the Medical Investigator (OMI), and Alanna Williams, a forensic scientist with the APD Crime Lab. Dr. Krinsky testified that the

3

cause of Victim's death was blunt force trauma, including to the head, neck, and anus, and that the manner of death was homicide. She also established that Victim's rectal tear was caused by the insertion of an object into Victim's rectum. Williams testified regarding the DNA evidence that connected Defendant to Victim's rape and beating. She identified multiple items of evidence containing the DNA of both Defendant and Victim and excluded three individuals whom Defendant attempted to implicate as Victim's assailant as possible DNA contributors with respect to all of the DNA evidence tested.

{6}     Defendant testified at trial and denied knowing Victim, confessing to anyone that he had killed Victim, or having any involvement in Victim's rape or the beating that led to Victim's death. In addition to generally attacking the credibility of the three witnesses who testified that he had confessed to them, defense counsel suggested that it was actually his roommate, Chris Carter, who had raped and beaten Victim. Defendant also attempted to argue that the actual cause of Victim's death was not the beating that caused Victim's traumatic brain injury but rather Victim's removal from life support.

{7}     The jury found Defendant guilty of second-degree murder, CSP, and two counts of tampering with evidence. This appeal resulted.

**DISCUSSION**

**{8}** Defendant argues that there was insufficient evidence to sustain his convictions for second-degree murder and CSP. He does not challenge the sufficiency of the evidence supporting his convictions for tampering with evidence but rather contends that, under the Double Jeopardy Clause, we should vacate one of the two tampering convictions because there were not two separate and distinct offenses. We address each issue in turn.

**I. The State Presented Sufficient Evidence to Convict Defendant of Second-Degree Murder and CSP**

**{9}** Defendant argues that there was insufficient evidence to support his convictions for second-degree murder and CSP because the State failed to establish that Defendant was the person who attacked Victim. With respect to his murder conviction, Defendant proffers an alternative argument that the State failed to present sufficient evidence to prove the causation element of murder, i.e., that the January 24, 2012 beating of Victim was the legal and proximate cause of his death, because Victim died only after being removed from life support. We disagree.

**A. Standard of Review**

**{10}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and

5

citation omitted). Our review involves a two-step process in which we first "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We then "evaluate whether the evidence, so viewed, supports the verdict beyond a reasonable doubt." *State v. Garcia*, 2016-NMSC-034, ¶ 24, ___ P.3d ___. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Our appellate courts "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations, internal quotation marks, and citation omitted).

**B.     The State Presented Sufficient Evidence to Support Defendant's Second-Degree Murder Conviction**

{11}     The jury in this case was instructed, in pertinent part, that in order to convict Defendant of second-degree murder, the State had to prove beyond a reasonable doubt that "[D]efendant killed [Victim.]" Defendant essentially argues that the State failed to prove two of the sub-parts of this element: (1) that it was Defendant who killed Victim (identity), and (2) that the beating Victim endured on January 24, 2012, was the cause of Victim's death (causation).

6

**1.   Identity**

{12}    Viewed in the light most favorable to affirming the guilty verdict, the facts that support the jury's determination that Defendant was the person who beat Victim are as follows. The jury heard from three witnesses that Defendant admitted to them that he had beaten Victim. Chris Carter, Defendant's roommate and the brother of his then-girlfriend, testified that Defendant told him that Defendant and Victim had gotten into a fight at Defendant's apartment and that Defendant had "hit [Victim] a little too hard." Carter further explained that Defendant "told me that he punched [Victim] and kicked [Victim] while he was on the couch, and that at first [Defendant] thought [Victim] was unconscious, but then when [Defendant] saw the blood from beating [Victim] up so bad, . . . [Defendant] carried [Victim] out of the apartment and dropped him off where the cops found him."

{13}    Defendant's then-girlfriend, April Franco, testified that when she went to Defendant's apartment in late January 2012, she observed a lot of furniture missing and a broken window. According to Franco, Defendant told her that there had been a party and that he had gotten into a fight. Defendant also told her that "he beat somebody up and drug him out of the apartment and put him by a truck." Franco specified that Defendant told her that he beat the person up by "kicking and hitting him in his head."

7

{14} The jury also heard from Justin Eric Garcia, Defendant's cellmate at the Metropolitan Detention Center in June 2013, who testified that Defendant admitted to him that Defendant had "beat somebody up and killed them." When pressed on cross-examination to clarify whether Defendant actually admitted to committing the murder or whether Defendant merely told Garcia that "the allegation was that he beat somebody up and killed them[,]" Garcia confirmed that Defendant told him that he committed a murder by beating someone.

{15} In addition to witness testimony about Defendant's confessions, the State presented physical and other evidence from which a jury could logically infer that Defendant was the person who beat Victim and left him to die in the parking lot at his apartment complex. For example, the trail of Victim's blood leading from where Victim was found to the area right outside Defendant's apartment supports the inference that Victim was beaten inside Defendant's apartment and that Defendant was involved in the events that led to Victim's injuries and ultimate death. This inference is further supported by the fact that blood spatter of the sort normally associated with a fatal beating was not found near Victim's body, suggesting he had been placed there only after being beaten. Also, Carter—whom Defendant implicated as Victim's assailant—testified that he did not move in with Defendant until January 26, 2012, leaving Defendant in sole possession of the apartment on January 24, 2012,

the day Victim was beaten. While Defendant first testified that Carter moved in "around possibly the middle to the late part of January" and later revised his testimony to "I would have to say it would be probably closer towards the end of the first week of January, to maybe the middle of the second week of January, 2012[,]" the jury was free to believe Carter and disbelieve Defendant. *See id.* ¶ 5. Finally, Alanna Williams, the State's DNA expert, testified that a blood swab taken from the north wall of Defendant's bedroom contained a mixture of DNA from two or more individuals and that "[Victim] could not be excluded as the minor contributor."

{16}     Based on the foregoing, we conclude that there was sufficient evidence to support the jury's determination that Defendant was the person who inflicted the injuries on Victim on January 24, 2012, that resulted in Victim's death.

**2.     Causation**

{17}     Defendant also challenges whether the State met its burden to establish that the beating that Victim sustained was the cause of his death. Defendant argues that "the uncontroverted evidence at trial established that [Victim died] because he was taken off of life support" and that "the cause of [Victim's] death was sufficiently in doubt that no reasonable jury could return a verdict of homicide." The State argues that Victim's cause of death was not a question of fact for the jury to resolve because the evidence established that Victim's cause of death was blunt force trauma. We agree

9

with the State.

{18} "General principles of criminal law do not require that a defendant's conduct be the *sole* cause of the crime." *State v. Simpson*, 1993-NMSC-073, ¶ 14, 116 N.M. 768, 867 P.2d 1150. "Instead, it is only required that the result be proximately caused by, or the natural and probable consequence of, the accused's conduct." *Id.* (internal quotation marks and citation omitted). "The conduct of other parties is relevant only if it is a superseding cause that negates the defendant's conduct." *Id.* "In cases where death results from multiple causes, an individual may be a legal cause of death even though other significant causes significantly contributed to the cause of death." *State v. Montoya*, 2003-NMSC-004, ¶ 19, 133 N.M. 84, 61 P.3d 793. "In these cases, a defendant is a but for cause of death if the death would not have occurred at the time it did and in the manner it did but for [the] defendant's actions." *Id.*

{19} In order to reverse Defendant's murder conviction based on the State's failure to prove causation, we would have to conclude that there were no facts that would have allowed the jury to find that Victim died because he was beaten. In support of his argument, Defendant relies on the testimony of Victim's treating physician, Dr. Stephen Lu, that Victim was still alive, had heart and lung function, was still breathing, and had some brain activity prior to being removed from life support. According to Defendant, "Dr. Lu testified that [Victim] died because medical services

were withheld." In fact, Dr. Lu's testimony was more nuanced than Defendant portrays. On cross-examination, Dr. Lu was asked, "Based on your medical expertise as a trauma surgeon, [Victim] died because the family withdrew or withheld medical services, correct . . . ?" Dr. Lu responded, "He died at that time, yes." Even if we were to agree that Dr. Lu's testimony indicated that removal from life support was *a* cause of Victim's death, that is not enough to reverse Defendant's conviction. Dr. Lu's testimony would have had to establish that Victim's removal from life support was a superseding cause that negated the effect of the beating Victim withstood. *See Simpson*, 1993-NMSC-073, ¶ 14. But the very reason that Victim was even on life support was that he had been brutally beaten and was "badly brain injured," as Dr. Lu described him. In other words, but for Victim being beaten to the point that he required emergency medical intervention, Victim never would have been on life support, and his family would never have had to make the painful decision to remove him from life support.

{20}     Furthermore, OMI forensic pathologist Dr. Clarissa Krinsky, who oversaw Victim's autopsy, testified that Victim's cause of death was "multiple blunt force injuries" and the manner of death was homicide. Unlike Dr. Lu, who was qualified as an expert in trauma surgery, Dr. Krinsky was qualified as an expert in forensic pathology, meaning she was in the best position to establish Victim's cause and

11

manner of death. On cross-examination, defense counsel attempted to pursue this causation theory and asked Dr. Krinsky what, if any, effect it would have on her determination of the cause and manner of Victim's death if she had learned that his family had decided to remove him from life support, after which he died. She responded that "[i]n a case like this, when a family withdraws care, that does not have a bearing upon the ultimate cause and manner of death." On redirect, Dr. Krinsky reiterated that Victim's ultimate cause of death was the blunt force trauma injuries inflicted on January 24, 2012.

{21} We hold that there was sufficient evidence from which the jury could conclude that Victim died as a result of the injuries he sustained when he was beaten. Because there was sufficient evidence as to both identity and causation, we affirm Defendant's conviction for second-degree murder.

**C.  The State Presented Sufficient Evidence to Convict Defendant of CSP**

{22} Defendant points to nothing in the record to support his argument that there was insufficient evidence to convict him of CSP. He generally argues that "the evidence was insufficient to establish that [Defendant] was the person who attacked [Victim]" and that he "adamantly denied being the perpetrator." He also continues to attack the credibility of the State's fact witnesses and asks us to "conclude that the accusations of State's witnesses were insufficiently credible to sustain his convictions." We

12

decline to do so. *See Garcia*, 2011-NMSC-003, ¶ 5 (explaining that appellate courts "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury" (alterations, internal quotation marks, and citation omitted)).

{23}    We agree with the State that there is sufficient evidence to support Defendant's conviction for CSP. First, Carter testified that Defendant told him that Defendant sexually assaulted Victim by penetrating his anus. More significant, though, was all of the physical evidence the State presented. Dr. Lu testified that when Victim was brought to UNMH, he was "bleeding out of his bottom, out of his anus and rectum." Dr. Lu identified the source of the bleeding as being a tear through the sphincter complex, which required rapid closure in order to prevent further contamination. Due to the nature of the injury and "a suspicion that a sexual assault had occurred," Debbie Acree, a Sexual Assault Nurse Examiner, was called to conduct an examination of Victim that same day. Because Victim was unconscious, Acree was not able to interview him, so she instead photographed Victim's injuries and took swabs to collect evidence from Victim's body. During Victim's autopsy, Dr. Krinsky investigated the possibility of sexual assault and concluded that "there was some sort of object placed in [Victim's] rectum." She discussed the type of force required to cause the rectal

tearing that Victim suffered, which she described as uncommon and not occurring naturally, and stated that "[i]t could have taken significant force to cause a rectal tear[,]" although she could not say exactly what kind of force was used. She also noted that Victim's rectal injuries "were severe enough to require surgery and a colostomy," which to her meant that it was "important to include [the rectal injuries] in the constellation of injuries that led to [Victim's] death."

{24} This evidence established that Victim sustained the rectal injury at or around the time he was beaten and that the injury was caused by the forceful insertion of an object into his anus. Other evidence discussed above placed Victim in Defendant's apartment and established that Defendant was in sole possession of the apartment on the date of Victim's attack, allowing the jury to conclude that it was Defendant who had beaten Victim. These pieces of evidence, construed together, were sufficient for the jury to convict Defendant of CSP.

**II.     Defendant's Convictions for Separate Counts of Tampering With Evidence Do Not Violate the Double Jeopardy Clause**

{25} Defendant argues that his convictions for two counts of tampering with evidence stem from a single course of conduct rather than discrete acts and, therefore, violate his right to be free from double jeopardy. We disagree.

{26} We review claims of double jeopardy de novo. *See State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77. The Double Jeopardy Clause, among

14

other things, protects a criminal defendant against multiple punishments for the same offense. *State v. Montoya*, 2013-NMSC-020, ¶ 23, 306 P.3d 426. Multiple punishments cases are "divided into two categories: 'unit of prosecution' cases—in which a defendant has been charged with multiple violations of a single statute based on a single course of conduct, and 'double-description' cases in which a defendant is charged with violations of multiple statutes for a single conduct." *State v. Bahney*, 2012-NMCA-039, ¶ 16, 274 P.3d 134 (alteration, internal quotation marks, and citation omitted). Regarding the former, "we consider whether [a d]efendant's acts are separated by sufficient indicia of distinctness." *State v. DeGraff*, 2006-NMSC-011, ¶ 35, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). "Such indicia include the timing, location, and sequencing of the acts, [and] the existence of an intervening event[.]" *Id.*

{27} In this "unit of prosecution" case, Defendant was convicted of two counts of tampering with evidence, in violation of NMSA 1978, Section 30-22-5 (2003), for (1) changing and/or placing and/or switching clothing on Victim, and (2) removing and/or disposing of a couch, both acts committed with the intent to prevent the apprehension, prosecution, or conviction of himself. The evidence adduced at trial established that the first occurrence of tampering—changing Victim's clothes—occurred on January 24, 2012, and took place inside Defendant's apartment. The second occurrence—the

15

removal and/or disposal of the couch from Defendant's apartment—did not occur until days later, after Victim was found and taken to the hospital. While the original location of the couch was the same as the location where Defendant tampered with Victim's clothing, the couch was ultimately removed to and/or disposed of in a different, albeit unknown, location. *See DeGraff*, 2006-NMSC-011, ¶¶ 36-37 (suggesting that the "location" indicia focuses on the distinctness of the evidence's ultimate placement, rather than its origin). Given that the two occurrences of tampering took place at different times, involved different locations, and were separated by the intervening event of Victim being discovered and transported to UNMH, we conclude that under our well-established double jeopardy precedent they were distinct violations for which Defendant could be separately convicted and punished. *See, e.g.*, *State v. Saiz*, 2008-NMSC-048, ¶ 41, 144 N.M. 663, 191 P.3d 521 (affirming three of the defendant's convictions for tampering with evidence based on "conceptually separate" acts that involved different items of evidence, were separated by time, and occurred at different locations), *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783; *DeGraff*, 2006-NMSC-011, ¶ 37 (affirming three separate convictions for tampering with evidence because the defendant hid different pieces of evidence at three different times and in three different locations).

**CONCLUSION**

**{28}** Because sufficient evidence supported Defendant's convictions for second-degree murder and CSP, and Defendant's convictions for separate counts of tampering with evidence do not violate the Double Jeopardy Clause, we affirm.

**{29}** **IT IS SO ORDERED.**

_____

**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Chief Judge**

_____

**JAMES J. WECHSLER, Judge**