IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

    Plaintiff-Appellee,

v.                                           **NO. 27,693**

JESUS CARMONA,

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Stephen Bridgforth, District Judge**

Gary K. King, Attorney General
Katherine Zinn, Assistant Attorney General
Santa Fe, NM

for Appellee

Inocenté, P.C.
Brian A. Pori
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

    This is the second time this case has come before us. In his first trial, Defendant was convicted of first degree kidnapping and aggravated battery on a household member. These convictions were based on evidence that Defendant

kidnapped and brutally attacked his girlfriend after she had ended their relationship and moved out. Defendant appealed, and we affirmed his convictions. Defendant then successfully pursued habeas corpus relief and was granted a new trial based on ineffective assistance of counsel. At the beginning of his second trial, he pled guilty to battery on a household member and went to trial solely on the kidnapping charge. He was once again convicted of first degree kidnapping.

In this appeal, Defendant contends that the evidence is insufficient to establish great bodily harm and that the kidnapping statute is unconstitutionally vague as applied. He also contends that the court erred in excluding evidence of a prior false claim by Victim, in admitting the prior testimony of Victim's twin sister, and in failing to impose an adequate sanction for the State's destruction of evidence. Finally, he contends that his convictions for aggravated battery on a household member and for kidnapping violate double jeopardy. We reject Defendant's contentions and affirm.

**BACKGROUND**

Victim testified that she and Defendant had lived together and had planned to get married. A couple of days before August 23, 2002, Victim had decided to leave Defendant and had moved out. On August 23, Victim was at the Tortilla Flats bar

when Defendant came in, followed shortly by her twin sister, Belinda, who was holding Victim's daughter. Defendant and Belinda got into a fight, with Defendant slapping Belinda, and the two of them pushing each other. At Victim's insistence, Victim, Belinda, and Victim's daughter left the bar. Belinda told Victim to get into Belinda's car, but Victim wanted to take her own car.

In the parking lot, Defendant was yelling at Victim and got into his truck. Defendant threatened her with his truck, moved his truck as she attempted to move her car, and as she tried to get away, he ran into her car with his truck. Before she knew it, Defendant was in her car, in the same seat with her. Defendant grabbed Victim by the hair and pulled it back so that she was looking straight up at the sky. He told her, "[d]rive, you fucking bitch. Drive."

Victim did not want to drive, but did what she was told to do. She felt that she was "overpowered at that point." She was in the driver's seat but Defendant was driving, because "[m]y head was pointing completely toward[] the sky." Defendant pulled the steering wheel to turn onto Moongate Road. He was madder than Victim had ever seen him, and he was still holding onto her hair and her head. Defendant was punching her in the face, pulling her hair back as hard as he could, and hitting her in the body and ribs.

Victim was desperate to get out of the car, so she opened the door and tried to jump out, even though the car was traveling 30-40 m.p.h. She was part way out of the car, with Defendant still holding onto her hair. Defendant stopped the car, got out, put his boot on her neck, and pulled up on her head. An elderly gentleman stopped to help, but Defendant scared the man away.

Defendant dragged Victim back into the car, drove away, and continued to attack her. He did not turn into their house, but instead turned into a desolate area. Victim said it "was just a constant beating the whole ride." Finally, she grabbed the steering wheel and turned it because "[t]he further we went down that road, the further away from life I was getting because I knew that I was going to die out there, and I didn't want to die out in the desert." As a result, the car got stuck on the side of the road.

Defendant pulled Victim out onto the ground, repeatedly kicked her in the face and ribs, and repeatedly strangled her with his hands until she lost consciousness. He kicked her near her eyes and in the jaw. Victim testified to not being able to breathe because she was hit so hard. He lifted the hood of the car and told her, "come here," because he wanted to put her head in the engine so he could close the hood on her head. She refused. He pulled the metal rod, used to prop the hood open, off her car.

She told the emergency room physician, Dr. Patterson, that Defendant had beaten her with the prop rod. However, at trial she could not remember if he hit her with it or not; "I was hit so many times that night, I don't know."

To get Defendant to stop, she told him she still loved him. He stopped hitting her, but said he would have to kill her because of what he had done to her face, and he worried that he would be imprisoned forever for what he had done. She told him she would lie and say that some girls had beaten her up outside of a bar. Defendant said, "I have to kill you. Look at your face."

By this time it was dark. They began walking and made it to a house, and the owner gave them a ride home. She said nothing to the man because she was afraid for her life. Once home, she could not see and did not try to get to the phone because she was afraid of Defendant. She could not stand or take a shower by herself. She was urinating blood, her ears were ringing so badly she could barely hear, and she could not see. Her jaw was almost locked shut, she could not turn or move her head, and she had great difficulty breathing. She wanted Defendant to take her to the hospital, but he would not, instead stated his concern that he was going to go to prison.

She plotted how she would get out of the house. She said she did not leave the bedroom because "I wanted to live, and I was willing at that point to do anything he

told me to." At some point, Felix Romo, a friend of Defendant's, came to the house. She told Defendant that if she were taken to the hospital she would use a false name and say she had been beaten by some girls outside a bar. She ultimately made a deal with Defendant and Mr. Romo that she would buy them cocaine if they would take her to the hospital. On the way to the hospital, she made good on her promise to buy drugs. Mr. Romo then took her to the hospital and carried her in.

**DISCUSSION**

**A.     Great Bodily Harm**

Defendant argues that the evidence is insufficient to establish great bodily harm. In reviewing this claim, we use a two-step process. Initially, the evidence is viewed in the light most favorable to the verdict. Then we determine "whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (internal quotation marks and citation omitted). "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

The parties do not dispute that the kidnapping statute in effect at the time Defendant committed his offense in 2002 required great bodily harm to support a first degree kidnapping conviction. Subsequent changes to the statute in 2003 do not affect this appeal. *See* NMSA 1978, § 30-4-1(A) (2003) (replacing the requirement of great bodily harm with "physical injury"). "Great bodily harm" means an injury to a person which creates a high probability of death or results in serious disfigurement or results in loss of any member or organ of the body or results in permanent or prolonged impairment of the use of any member or organ of the body. UJI 14-131 NMRA.

When Victim arrived at the hospital, Dr. Welsh, a plastic surgeon, determined that the facial bones around her eyes were broken. She had blood behind each eardrum, indicating a fracture at the base of her skull. Her eyes were swollen completely shut. She had so much swelling that Dr. Patterson, the emergency room physician, could not examine her eyes, and had to rely on an ophthalmologist for that exam. She had to be given medication and a sedative before the ophthalmologist could even open her eyes to check her eyeballs. She had blunt injuries, including bruises, swelling, and fractures. Her face and neck were swollen and slightly discolored, and her neck injuries were consistent with manual strangulation. Victim

testified that her breathing was labored because of pain in her ribs, her ears were ringing so badly she could hardly hear, and she was urinating blood.

Victim was in the hospital for five days. She developed periorbital cellulitis, a serious infection of the tissue around the eyes. To treat it, Dr. Welsh cut the tissue around her eyes to drain the accumulated pus and placed her on antibiotics. Her jaw was also drained due to the infection. Dr. Welsh treated her for about a month after her release from the hospital. Victim testified that one eye was pinched shut for one month, and when the eye finally opened, the eyeball was pointing backward. Victim has scarring from the incisions around her eyes, and one of her eyes is sensitive to light and allergens and is sometimes swollen. She was unable to go back to work for about six months.

In support of his argument that the evidence is insufficient to establish great bodily harm, Defendant seizes on an isolated portion of Dr. Welsh's testimony that they were fortunate because the only serious thing was the infection, and it was resolved. Defendant describes the episode as involving "no serious injury . . . except a treatable infection which was resolved." He argues that Victim had only "two black eyes, swollen cheeks, and marks on her neck, none of which were life-threatening." He asserts that she was not completely deprived of the use of any member or organ

8

of her body "for an extended length of time." Finally, he concludes that a sensitivity to light does not establish great bodily harm.

Defendant's attempt to isolate particular testimony and to downplay the severity of the injuries is unpersuasive. His arguments were for the jury to consider, and it rejected them. Victim's injuries, including fractured facial bones near the eyes, were severe and serious. Some of the physical effects are lasting. In our view, any rational jury could find that Victim suffered great bodily harm.

**B.      Void for Vagueness**

Defendant next argues that the kidnapping statute is unconstitutionally vague. We review this issue de novo. *See State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 24, 137 N.M. 687, 114 P.3d 367. Statutes are strongly presumed to be constitutional, and "the defendant has the burden to prove unconstitutionality beyond all reasonable doubt." *Id.* ¶ 32. A statute may be vague on its face or as applied. *See State v. Laguna*, 1999-NMCA-152, ¶¶ 25-26, 128 N.M. 345, 992 P.2d 896. A statute is vague on its face if it does not give fair warning to a person of ordinary intelligence what the law requires. *Id.* ¶ 25. A statute is unconstitutional as applied if the statute has no standards or guidelines and thus allows arbitrary and *ad hoc* enforcement by police, prosecutors, judges, and juries. *Id.* ¶ 26.

If a statute clearly applies to a defendant's conduct, it is not unconstitutional as applied. *Id.* ¶ 24.

We have already held that the kidnapping statute is not unconstitutionally vague on its face because it gives fair warning to people of ordinary intelligence what the law requires. *See id.* ¶¶ 29-30. Defendant, however, contends that it is unconstitutional as applied to his case. His argument that the statute is vague as applied focuses on the requirement that the act of kidnapping must be accompanied by the intent to inflict great bodily harm. He argues that because the jury could not pinpoint with precision when his intent developed, then the statute is vague as applied. He also argues that "a person who voluntarily permitted [Victim] to go to the hospital cannot understand when his alleged acts violated the law."

We reject Defendant's arguments. In criminal cases, intent is often not susceptible of proof by direct evidence, and our cases frequently observe that intent may be proven by circumstantial evidence. *See State v. Hoeffel*, 112 N.M. 358, 361, 815 P.2d 654, 657 (Ct. App. 1991). During kidnapping, a defendant's intent may arise in many ways and it would be impossible to state them all with exactitude. The fact that intent is not always capable of precise determination does not mean that the

statute is vague as applied. *Cf. Shawna C.*, 2005-NMCA-066, ¶ 37(stating that a law's generality is not the equivalent of vagueness).

To support Defendant's conviction, the jury had to find that Defendant kidnapped Victim with the intent to inflict great bodily harm. From Defendant's statements made outside the bar that he was going to "kill [her]," or that he would "knock the crap out of [her]" if she did not do what he wanted, and from evidence that Defendant inflicted great bodily harm throughout the kidnapping, the jury could infer that he had that intent. *See Cunningham*, 2000-NMSC-009, ¶ 29 (stating that the defendant's earlier statement in which he threatened the victim's life constituted circumstantial evidence of the defendant's deliberate intention to kill); *State v. McGuire,* 110 N.M. 304, 308-09, 795 P.2d 996, 1000-01 (1990) (noting that evidence of a later sexual assault by the defendant on the victim may be used by the jury to infer that the defendant had the necessary criminal intent to hold the victim for service against her will at the time she was first kidnapped). Evidence that Defendant was intent on violence, of his protracted restraint of Victim, and of the great bodily harm he caused, establishes a classic case of first degree kidnapping. We conclude that the statute clearly applies to Defendant's conduct, and therefore the statute is not unconstitutional as applied. *See Laguna*, 1999-NMCA-152, ¶ 24.

Defendant's argument that he allowed Victim to go to the hospital and could not have known when his acts violated the law is equally unpersuasive. If Defendant's claim is that he did not understand the statute and did not know what the law required, we reject that claim. *See id.* ¶¶ 29-30 (holding that the kidnapping statute gives reasonable notice to people of ordinary intelligence of what the law requires). If Defendant is relying on his own purported confusion about what the law required, we reject this argument as well. The test is an objective one, dealing with what a person of ordinary intelligence would understand from reading the statute. *See id.* ¶ 25. It is not a subjective test, and Defendant's own inability to understand what the law requires does not render the statute unconstitutional.

We also reject Defendant's argument that he allowed Victim to go to the hospital because it narrowly focuses only on the evidence that is favorable to him. The fact that Defendant finally allowed Victim to go to the hospital ignores the quantum of evidence establishing that Defendant's actions, beginning in the parking lot, involved taking Victim by force, restraining her for a lengthy period of time, and brutally beating her. Allowing her to go to the hospital occurred much later in the chain of events. As we have discussed, sufficient evidence established first degree

kidnapping. Because the kidnapping statute clearly applies to Defendant's conduct, the statute is not unconstitutional as applied. *See id.* ¶ 24.

**C.      Evidence of Prior False Claims**

Defendant contends that the court improperly ruled that he could not admit evidence of a prior false claim by Victim. We review this issue for an abuse of discretion. *See State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72.

According to Defendant, Victim's ex-boyfriend, Adrian Villa, would have testified to a 1997 incident of domestic violence. Defendant told the court that Victim "filed a police report against [Mr. Villa] accusing him of kidnapping, and those charges were ultimately dropped." The court would not allow that testimony. Later, when the issue arose again, Defendant told the court that the issue involved a false complaint for auto theft. He argued that the circumstances of the prior incident were similar to those in this case.

In the course of the investigation of the 1997 domestic violence incident, Victim accused Mr. Villa of stealing her car. Mr. Villa ultimately pled guilty to a drug charge in exchange for having the domestic violence charges dropped. The police determined, however, that there was insufficient evidence to support the stolen car

13

allegation. After reviewing the police report from the incident, the court ruled that Mr. Villa's testimony was not relevant. It expressed its view that the prior incident was remote, having occurred five years earlier. "In reading the [police] report, it's certainly clear that [Victim] felt like it should be treated as a stolen car because of the nature of how [Mr. Villa] took it, but it's also true the detective determined right away that it was inappropriate to file that charge based on what they had." The court concluded that bringing in Mr. Villa to venture an opinion that Victim had filed a false charge was "too remote, not relevant and fraught with risk."

At a minimum, Defendant bore the burden of demonstrating that the prior claim was false. *See State v. Johnson*, 1997-NMSC-036, ¶ 27, 123 N.M. 640, 944 P.2d 869 (noting that one factor in determining whether to admit evidence of a prior act of a victim is whether it was committed); *State v. Jordan*, 116 N.M. 76, 79, 860 P.2d 206, 209 (Ct. App. 1993) (same). The flaw in Defendant's argument is that Victim's allegation was not demonstrably false. The fact that the police chose to pursue the domestic violence, drug, and weapons charges against Mr. Villa, and were uninterested in pursuing the stolen car charge, does not establish falsity. At most, it reflects an assessment that there was insufficient evidence to support it. Alternatively, it is consistent with a mistaken belief by Victim that Mr. Villa had stolen her car. The

14

failure of the police to pursue the charge might also indicate a practical approach to the incident of domestic violence and reflect a decision to pursue the many charges that were the most strongly supported. Without a showing of falsity, Mr. Villa's opinion is simply not relevant. *See* Rules 11-401, -402 NMRA (stating that irrelevant evidence is inadmissible).

There is another reason why the evidence was inadmissible. Granting Defendant's request would have involved introducing evidence detailing the prior incident of domestic abuse between Victim and Mr. Villa, as well as testimony and cross-examination about the facts surrounding the taking of Victim's car. No police officer was to be called to establish falsity. Defendant was relying solely on a police report and on Mr. Villa's own opinion that Victim's stolen car allegation was false. This kind of testimony is inadmissible extrinsic evidence under Rule 11-608(B) NMRA. *See Jordan*, 116 N.M. at 80, 860 P.2d at 210. On the information presented by Defendant, the court properly exercised its discretion in rejecting this tangent. We hold there was no abuse of discretion.

In his reply brief, Defendant claims that Mr. Villa should have been allowed to express his opinion on Victim's reputation for truthfulness. This specific argument was not preserved. *State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d

15

1280 (stating that to preserve an error for review, the defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error). It also comes too late. *See Jordan,* 116 N.M. at 82, 860 P.2d at 212 (stating that a claim raised for the first time in a reply brief is ordinarily too late).

**D.     Admission of Prior Testimony of Belinda Dillon**

At the first trial, Belinda Dillon, Victim's twin sister, testified about what happened inside and outside the bar. She died before the second trial, and the State asked the court to admit her prior testimony. Defense counsel said, "I don't have a huge objection. I think, for the record, we should note the prior conviction was reversed based on a finding of ineffective assistance of counsel." The court observed that Ms. Dillon was cross-examined and ruled that the testimony would be admitted. Defendant argues that this violated his right to confront witnesses against him. We review this claim de novo. *See State v. Henderson,* 2006-NMCA-059, ¶ 6, 139 N.M. 595, 136 P.3d 1005 (stating that whether prior testimony was admitted in violation of a defendant's right of confrontation is reviewed de novo).

When a defendant has been given the opportunity to cross-examine a witness, the prior testimony is admissible. *See id.* ¶ 16 (holding that the defendant's right of confrontation, as provided by *Crawford v. Washington*, 541 U.S. 36 (2004), was not

16

violated by the admission of a witness's prior testimony where the defendant had the opportunity for cross-examination). Defendant had that opportunity at his first trial. That is sufficient. *See Henderson*, 2006-NMCA-059, ¶ 16.

Defendant, however, claims that because defense counsel was ineffective, it is as if there had been no opportunity for cross-examination and that the prior testimony is inadmissible because it is as if there had been no cross-examination at all. He has cited two cases for this proposition, *Mancusi v. Stubbs*, 408 U.S. 204 (1972), and *United States v. Ciak*, 102 F.3d 38 (2d Cir. 1996). Both cases deal with a situation in which counsel was ineffective in a prior trial, and the prosecution introduced prior testimony at a second trial. Neither case found reversible error. In *Mancusi*, the Court found that the defendant had shown no specific prejudice. *See* 408 U.S. at 213-16. In *Ciak,* the court found that habeas relief had been granted, in part, based on inadequate cross-examination of another witness, not of the witness whose prior testimony was being admitted. Therefore, the court held that the prior testimony was admissible. *See* 102 F.3d at 44. Accordingly, neither case supports Defendant's request for reversal.

Under the facts, we are not persuaded that the admission of Ms. Dillon's prior testimony constitutes reversible error. Defendant's habeas petition did not raise

17

inadequate cross-examination of Ms. Dillon as a problem. His only claim regarding cross-examination was that counsel did not adequately cross-examine Victim.

Moreover, Defendant has not shown specific prejudice. Defendant points out that Ms. Dillon had prior convictions and that counsel did not bring that out on cross-examination. This is an obvious shortcoming, but it was cured at the second trial when, at Defendant's request, the court instructed the jury that Ms. Dillon had a prior conviction for forgery. Other than cross-examination of Ms. Dillon about her prior forgery conviction, which was cured on retrial, Defendant has provided no concrete ideas about what additional cross-examination would have explored, or how it would have helped. Without that showing, we are unwilling to depart from the rule that prior testimony is admissible if there was a prior opportunity for cross-examination. Because Defendant had a prior opportunity and has not shown specific prejudice, we find no error.

Additionally, even if we were to find error, we would conclude that it was harmless. *State v. Johnson*, 2004-NMSC-029, ¶ 7, 136 N.M. 348, 98 P.3d 998 (stating that if the defendant's Sixth Amendment right of confrontation was violated "[w]e must address, therefore, whether the violation was harmless in this case"). "[T]he central focus of the *Chapman* inquiry has always been 'whether there is a reasonable

18

possibility that the evidence complained of might have contributed to the conviction.'" *Id.* ¶ 9 (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* ¶ 11 (internal quotation marks and citation omitted).

Ms. Dillon's testimony was relatively brief. She testified how, outside of the bar, Defendant rammed Victim's car, that he was screaming at Victim, and described how he jumped into Victim's car. She testified that Defendant stated he was going to kill Victim. Ms. Dillon's testimony is very similar to that of Mr. Stroud, the bar security guard, who also testified that Defendant rammed Victim's car, berated her, and jumped into her car. Like Ms. Dillon, he testified that Defendant was intent on violence, testifying that Defendant had said he would "knock the crap out of [Victim]" if she did not do what he wanted. Consequently, we conclude that Ms. Dillon's testimony was not critical, was cumulative, and was corroborated by the testimony of Mr. Stroud, as well as by Victim. We further conclude that the State's case was well supported.

Because Defendant had the opportunity for prior cross-examination, and has not demonstrated any prejudice from the absence of additional cross-examination, we conclude that the admission of Ms. Dillon's prior testimony was not constitutional error. Even if we were to conclude that there was error, we see no reasonable possibility that Ms. Dillon's testimony might have contributed to the conviction.

**E.      Lost Evidence**

Defendant contends that the State's destruction of evidence required dismissal of the case or, alternatively, a ruling that Victim could not testify. As the court recognized, prohibiting Victim from testifying would be the equivalent of dismissing the case.

The destroyed evidence consisted of jeans worn by Victim, Defendant's cowboy boots, and Victim's cowboy boots. This evidence was destroyed after this Court affirmed Defendant's convictions and issued our mandate in the prior appeal, but before Defendant filed the petition for habeas corpus that resulted in a new trial. The court denied Defendant's motion to dismiss, finding no bad faith by the State, finding that the evidence was material, but concluding that its destruction was not prejudicial. The court dealt with the issue by giving a special instruction informing the jury that Defendant's and Victim's boots, and Victim's jeans, had been destroyed,

20

that the destruction had not been in bad faith, and that "[y]ou may but are not required to draw the inference that the destroyed evidence was potentially exculpatory."

To determine whether deprivation of evidence is reversible error, we apply the test from *State v. Chouinard*, 96 N.M. 658, 661, 634 P.2d 680, 683 (1981). Under that test, the State must either breach some duty or intentionally deprive the defendant of evidence, the evidence must have been material, and the loss of the evidence must have prejudiced the defendant. *Id.* The trial court has discretion to fashion an appropriate remedy, and we review that decision for an abuse of discretion. *Id.* at 662-63, 634 P.2d at 684-85.

Defendant has failed to designate the transcript of the hearing on this issue. "It is [a d]efendant's obligation to provide this Court with a sufficient record proper." *State v. Druktenis*, 2004-NMCA-032, ¶ 44, 135 N.M. 223, 86 P.3d 1050. "Where there is a doubtful or deficient record, every presumption must be indulged by the reviewing court in favor of the correctness and regularity of the [trial] court's judgment." *State v. Rojo*, 1999-NMSC-001, ¶ 53, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted). Without the transcript, we do not know what Defendant or the State argued, nor do we have the benefit of any reasoning stated by the court. We could reject Defendant's argument on this issue for this

21

reason alone. *See State v. Gilbert*, 98 N.M. 77, 81, 644 P.2d 1066, 1070 (Ct. App. 1982) (stating that a defendant's failure to include the transcript of the motion hearing would normally preclude review).

Even on the merits, Defendant's argument is unpersuasive. Defendant ascribes a sinister motive for the State's destruction of the evidence. However, the State did not destroy the evidence until our mandate affirming had been issued. Nothing was pending at that point. Defendant argues that the State should have preserved the evidence for future litigation, including a habeas corpus proceeding. We decline to determine that the State breached some duty or intentionally deprived Defendant of the evidence. The case had been affirmed, and there is no evidence the State knew a habeas proceeding was in the offing.

We turn next to materiality and prejudice. Defendant makes the sweeping statement that "the failure to preserve this evidence severely prejudiced [him] because he forever lost the opportunity to impeach the state's chief witness with physical evidence which would have belied her claims." This is an overstatement. Defendant's assertion assumes the evidence was favorable to him and "would have" impeached Victim. But it was the State that relied on the evidence, thereby suggesting that the evidence was unfavorable to Defendant. Rather than harming Defendant,

22

destruction of the evidence may have helped him by eliminating evidence that was not considered favorable to him in the first trial.

On retrial, Defendant suggested to the trial court that the boots and jeans could have provided useful information because testing might have revealed no dragging marks on Victim's boots or might have revealed blood spatter on the clothing. This is not compelling. Defendant's argument about Victim's boots focuses on Victim's assertion that, as she tried to jump out of the car, she had been dragged by Defendant. Defendant perhaps hoped to show that, if the boots had not been damaged, the lack of damage might cast doubt on her claim. We suspect that at the first trial Victim may have testified that she had been dragged. In this trial, however, her testimony does not clearly describe being dragged along the ground. Instead, it very briefly describes her being part way out of the car and trying not to get her legs run over by the back wheel. In any event, even if we were to assume she was being dragged, at most the absence of drag marks on her boots would cast doubt on only a very discrete part of her testimony. There was other, ample evidence that she had been kidnapped and severely beaten by Defendant. Whether she had been dragged or not was not central to the case. Evidence about blood spatter was not critical either. Defendant suggested that blood spatter might have been tested to determine if it was consistent with Victim's

report. Given the facts in this case, blood spatter, or its absence, would not have explained away the significant and damaging evidence of the beating Victim suffered.

We conclude that the State did not intentionally deprive Defendant of the evidence, that Defendant's arguments about the potential value of the evidence is speculative, and that Defendant has not shown prejudice. *See Chouinard*, 96 N.M. at 663, 634 P.2d at 685 (holding that there was no reversible error where the defendant offered only speculation that the lost evidence would have undercut the State's case). Consequently, dismissal of the case, or the equivalent of dismissal–prohibiting Victim from testifying–would have been a windfall to Defendant, and out of proportion to the event. The court's treatment of the issue was appropriate, and we see no abuse of discretion.

**F.      Double Jeopardy**

Finally, Defendant contends that his convictions for battery on a household member and for kidnapping violate double jeopardy. He argues that the acts were not distinct because there was one continuous incident and one victim. We review his double jeopardy claim de novo. *State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77.

24

Under *State v. Saiz,* 2008-NMSC-048, ¶ 30, 144 N.M. 663, 191 P.3d 521, we examine the trial record to determine whether Defendant's acts are separated by sufficient indicia of distinctness to be considered non-unitary conduct. Distinctness is determined by considering whether the acts are separate in time and space, "the quality and nature of the acts, the objects and results involved, and the defendant's *mens rea* and goals during each act." *Id.* The proper analysis is whether the jury reasonably could have inferred independent factual bases for the charged offenses. *Id.*

Here, there is ample evidence from which the jury could reasonably infer a separate course of conduct underlying the kidnapping and separate from the battery. Defendant's acts were not coextensive. Defendant's acts were separated in time and location. The kidnapping that began in the bar parking lot and, at least initially, was not accompanied by battery. Additionally, there was a period of time, after Defendant finally stopped beating Victim, when the jury could find that Defendant was restraining Victim by keeping her present, by keeping her in the house, and by refusing to take her to the hospital. On the evidence, the jury could infer that Defendant's physical attack was not coextensive with his restraint of Victim. The quality and nature of Defendant's acts were different, his mens rea was different, and

25

his goals were different.  We conclude that the evidence establishes that the two crimes were distinct and that the jury could reasonably infer separate factual bases for them.  Consequently, we hold there was no double jeopardy violation.  *See id.* ¶¶ 33-34 (holding that where the evidence suggested that the defendant forcibly restrained the victim as part of an attempted sexual assault, and then killed her, the jury could reasonably infer separate factual bases for kidnapping and murder).

Defendant's conviction is affirmed.

**IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**LINDA M. VANZI, Judge**

26