**Certiorari Granted, December 7, 2011, No. 33,287**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2011-NMCA-121**

**Filing Date: October 25, 2011**

**Docket No. 30,110**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**ELIAS URIOSTE,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Carl J. Butkus, District Judge**

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

Kennedy & Han, P.C.
Paul J. Kennedy
Mary Y.C. Han
Darin M. Foster
Arne R. Leonard
Albuquerque, NM

for Appellant

## OPINION

**SUTIN, Judge.**

**{1}**    Following a jury trial, Defendant Elias Urioste was convicted of voluntary manslaughter, aggravated battery with a deadly weapon, three counts of tampering with

evidence, and two counts of conspiracy to commit tampering with evidence. His victim was Vincent Espinosa (Victim). Defendant was sentenced to a total of forty years imprisonment. We affirm Defendant's convictions of voluntary manslaughter, aggravated battery, and tampering with evidence, and we reverse Defendant's convictions of conspiracy to commit tampering with evidence.

**BACKGROUND**

{2}    Victim was last seen by his family on January 28, 2007. On that date, Victim and his brother were helping their grandmother move. Victim told his brother that he had to "go down to the valley[,]" and later that day he had planned to go to a barbeque. Victim's friends and family never heard from him again.

{3}    On January 28, 2007, Fred Barncastle and his family were driving around the Double Eagle Airport watching airplanes. As Barncastle drove east, away from the airport, he noticed a fire to the south that "started up real fast, and then . . . died down[.]" He guessed that the fire was on the mesa. Around the same time that he noticed the fire, Barncastle also noticed a "dull gray" Lincoln automobile coming from the south. Barncastle, who was going the speed limit, noticed that the Lincoln passed him "pretty fast."

{4}    On February 19, 2007, Matthew Cordova took his daughters "out riding around" near the Double Eagle Airport. As he drove down a dirt road, he spotted what he described as "a man laying there burn[ed] to death" underneath a burned couch. The body was later identified as that of Victim.

{5}    Detective Jennifer Garcia, the lead criminalist in the investigation collected a number of items of evidence from the scene. Among other items near Victim's body, Detective Garcia found five .9 millimeter bullet casings just to the northwest of Victim's head.

{6}    Victim's body, having been transported to the office of the medical investigator, was examined by the chief medical investigator, Dr. Ross Zumwalt. Dr. Zumwalt determined that Victim had been shot three times, once in the chest and twice in the head. Two of the three bullets passed through Victim's body and were not recovered. One bullet, however, was recovered from just beneath the skin in the back of Victim's skull. Later analysis of the recovered bullet revealed that it was a .9 millimeter Luger, the same caliber as casings found near Victim's body.

{7}    Dr. Zumwalt could not determine whether the chest wound or the head wounds occurred first. He suspected that Victim was still alive when the chest wound occurred because Victim "certainly bled a lot." He added that the head wounds, which would have been fatal in and of themselves, "would not necessarily have caused [Victim's] heart and lungs to stop functioning for a little while[,] . . . so the chest wound could have been second or it could have been first[.]"

{8}    Dr. Zumwalt concluded that the three shots occurred within minutes of one another, and he explained that Victim would not have lived long after either the shots to his head or

2

to his chest. Dr. Zumwalt also concluded that Victim would have been rendered unconscious immediately from the head wounds and within a few seconds from the chest wound. Whether the head wounds or the chest wound came first, however, Victim would have lived for only a short period of time.

{9}     Victim's body had been burned. While Victim's body was "badly charred," Dr. Zumwalt concluded that Victim was probably dead before the fire because there was no evidence in Victim's body of soot or carbon monoxide inhalation. The arson investigator determined that the fire was incendiary or intentionally started.

{10}     "[S]ometime before March 2007[,]" for reasons unrelated to the present case, police raided the home of Brandon Neal, a member of the "South Side" gang. Neal began cooperating with the police and decided to "give [the police] everything [he knew]" because he was planning to leave New Mexico. Among other things, Neal knew Defendant and knew details of Victim's murder as they had been related to Neal by Defendant.

{11}     According to Neal, Defendant said that he (Defendant), along with Victim and two others, were driving around in Defendant's gray Lincoln Town Car popping "zany bars" (narcotic pills). Defendant and Victim "got into some kind of argument and [Defendant] happened to shoot [Victim,]" and when this happened, Defendant was driving and Victim was in the back seat. After Victim had been shot, at first, they (Defendant and two others) were going to take Victim to the hospital but when they realized he was unconscious, they chose instead to "put him on a couch in the mesa and . . . [light] him on fire."

{12}     According to Neal, Defendant also said that he and the two others had burned the vehicle. At some point prior to having burned the Lincoln, however, Defendant "gave it away . . . to one of [Neal's] little friends," but when Neal told his friend what had occurred in the vehicle, "the guy . . . dropped it off somewhere." Defendant claimed, however, that he sold the vehicle to Neal.

{13}     Another gang member, who belonged to the "TCK" gang and affiliated with the "South Side" gang, Jason Rubio, also shared information about Victim's death with police. According to Rubio, Defendant told him "[t]hey[, Defendant and two others,] jacked [Victim], took him to the mesa, poured gas down his throat[,] made him drink gas, put the gun to his head, made him drink gas, shot him[,] and lit him on fire." Rubio also knew that the incident occurred in Defendant's "silver" Lincoln Town Car.

{14}     "[A]t some point" during the investigation into Victim's homicide, Detective Garcia learned from the lead homicide detective, Judy Chavez, that a Lincoln Town car that was suspected to have been involved in this case was at a tow yard in Albuquerque. Detective Garcia along with a team of criminalists and homicide detectives examined the vehicle. The interior of the vehicle was "completely burned" from a fire that appeared to have originated in the back seat. The front seat and the steering wheel were melted or charred, and there was much more damage to the back seat. A portion of the back seat was collected because it appeared to have a bullet hole through the metal behind the seat. The detectives also collected a bottle with a white rag or shirt tucked into it called a "molotov cocktail."

3

**{15}**     Defendant makes three arguments on appeal.  First, he contends that his convictions for kidnapping and aggravated battery violate the prohibition against double jeopardy and argues that they were not supported by substantial evidence.  Second, Defendant contends that his convictions for tampering with evidence and conspiracy to tamper with evidence were a violation of the prohibition against double jeopardy and a violation of his due process rights, and he argues that they were the result of cumulative errors at trial.  Finally, Defendant argues that the district court erred in admitting evidence both of gang affiliation and of threats against witnesses. We examine each of Defendant's arguments.  We affirm all of Defendant's convictions with the exception of the conspiracy to tamper with evidence charges, which we reverse on the basis of a due process violation.

## DISCUSSION

**Prohibition Against Double Jeopardy Was Not Violated
by Defendant's Convictions for Kidnapping and Aggravated Battery**

**{16}**     Defendant argues that his convictions for kidnapping with an intent to inflict death or physical injury, in violation of NMSA 1978, Section 30-4-1(A)(4) (2003), and for aggravated battery with a deadly weapon, inflicting great bodily harm, in violation of NMSA 1978, Section 30-3-5(C) (1969), when coupled with his conviction for voluntary manslaughter in violation of NMSA 1978, Section 30-2-3(A) (1994), violated his constitutional right to be free from double jeopardy because all three convictions were premised on the unitary conduct of fatally shooting Victim. We review de novo Defendant's claim that his right to be free from double jeopardy was violated.  *State v. Quick,* 2009-NMSC-015, ¶ 6, 146 N.M. 80, 206 P.3d 985.

**{17}**     This case is a double-description, multiple-punishment case.  The proper analysis to determine whether a double jeopardy violation has occurred is a two-pronged test known as the *Swafford* test.   *State v. Armendariz*, 2006-NMSC-036, ¶ 20, 140 N.M. 182, 141 P.3d 526.  The *Swafford* test first requires a determination of whether the conduct underlying the offenses was unitary.  *Armendariz*, 2006-NMSC-036, ¶ 21.  "If the conduct [was] not unitary, then the inquiry is at an end and there is no double jeopardy violation."  *State v. Contreras*, 2007-NMCA-045, ¶ 20, 141 N.M. 434, 156 P.3d 725 (internal quotation marks and citation omitted).

**{18}**     "If two events are sufficiently separated by either time or space . . . , then it is a fairly simple task to distinguish the acts."  *Swafford v. State*, 112 N.M. 3, 13-14, 810 P.2d 1223, 1233-34 (1991).  "In determining whether [a d]efendant's conduct was unitary, we consider whether [a d]efendant's acts were separated by sufficient indicia of distinctness."  *State v. Lopez*, 2008-NMCA-002, ¶ 16, 143 N.M. 274, 175 P.3d 942 (internal quotation marks and citation omitted).  "Distinctness may . . . be established by the existence of an intervening event, the defendant's intent as evinced by his or her conduct and utterances, the number of victims, and the behavior of the defendant between acts." *Id.* (internal quotation marks and citation omitted).

4

**{19}** To the extent that Defendant and the State have differing views of the facts surrounding Victim's death and the associated crimes, we "view the evidence in the light most favorable to the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict." *State v. McClendon*, 2001-NMSC-023, ¶ 3, 130 N.M. 551, 28 P.3d 1092. Our primary concern is to ensure that each act supporting Defendant's separate convictions was supported by sufficient evidence. *See id.* ¶ 5. "In reviewing the facts of the case to determine if each [act was] distinct from the others, we must indulge in all presumptions in favor of the verdict." *Id.* (internal quotation marks and citation omitted).

**{20}** Because the jury convicted Defendant on the charge of voluntary manslaughter and not on the charges of first or second degree murder, we must conclude that the jury found that the fatal shot was the first shot which was fired inside Defendant's vehicle and that this shot took place before Victim was transported to the mesa. The jury instruction on voluntary manslaughter required, for a determination of guilt, that the jury find sufficient provocation to justify Defendant's actions. Any provocation could have only occurred in the vehicle before Victim was transported to the mesa.

**{21}** Dr. Zumwalt testified that, because of the destructive nature of the chest wound, Victim would have "probably been unconscious within a few seconds" but may have been alive for "several minutes[.]" The only evidence of Victim's condition after having been shot twice in the head is that he would have been "immediately unconscious[.]" Thus, it would be reasonable for the jury to presume that, once Victim was taken to the mesa, he could not possibly have provoked Defendant. The jury necessarily determined that the voluntary manslaughter occurred when Defendant shot Victim in the chest in the vehicle. We turn to the other criminal activity.

**{22}** The jury could have concluded, based on the evidence presented, that either of the two gunshots on the mesa constituted an aggravated battery that occurred before Victim died from the initial gunshot wound to the chest. Those gunshot wounds occurred within minutes after the first gunshot wound in the vehicle and at a different location. We hold that Defendant's conduct in shooting Victim twice in the head was sufficiently "separated by . . . time [and] space" from the first gunshot wound inside Defendant's vehicle. *See State v. Mireles*, 2004-NMCA-100, ¶¶ 27-28, 136 N.M. 337, 98 P.3d 727 (concluding that convictions for second degree murder and shooting at or from a motor vehicle were separated by time and space because the defendant first shot the victim from inside a car, then exited the vehicle, chased the victim, and shot him again).

**{23}** We turn now to the kidnapping charge. The jury was instructed that in order to find Defendant guilty of kidnapping, the State was required to prove that (1) ". . . [D]efendant took and transported [Victim] by force, intimidation, or deception; [and (2)] . . . [D]efendant intended to hold [Victim] against [his] will to inflict death or physical injury [upon him.]"

**{24}** With regard to the first kidnapping element, the State presented evidence that after shooting Victim in the chest, in the vehicle, Defendant and the two others considered taking him to the hospital but, because he was unconscious, decided instead to take him to the mesa. A number of other jurisdictions have determined that use of force required for a

kidnapping conviction is significantly decreased when the victim is unconscious at the time that he is taken by his kidnapper. *See State v. Bernal*, 713 P.2d 811, 812 (Ariz. Ct. App. 1985) (holding that the defendant committed kidnapping by abducting the unconscious victim and killing her before she regained consciousness); *People v. Daniels*, 97 Cal. Rptr. 3d 659, 682 (Ct. App. 2009) (stating that "[s]ince an incapacitated person, like an infant, has no ability to resist being taken and carried away, . . . the amount of force required to kidnap an incapacitated person is simply the amount of physical force required to take and carry the . . . person away" (alterations omitted) (internal quotation marks and citation omitted)); *State v. Valdez*, 977 P.2d 242, 253 (Kan. 1999) (finding sufficient confinement for a kidnapping conviction where the victim's unconscious body was placed in a car and driven away), *abrogated on other grounds by State v. James*, 79 P.3d 169 (Kan. 2003); *State v. Pendleton*, 759 N.W.2d 900, 904-05, 910 (Minn. 2009) (upholding the defendant's conviction for first degree murder in the course of a kidnapping due to the defendant's movement of the victim's unconscious body). We agree with these authorities and hold that the jury could reasonably have concluded that the requisite force to support Defendant's kidnapping conviction was the force that was used to transport the unconscious Victim to the mesa after he was shot in the chest.

**{25}**     Regarding the second kidnapping element, the jury could reasonably have inferred that at the moment Victim was shot in the chest by Defendant, Victim was in the vehicle against his will, thereby making his physical association with Defendant no longer voluntary. *See State v. Pisio*, 119 N.M. 252, 260, 889 P.2d 860, 868 (Ct. App. 1994) (stating that "[t]he key to the restraint element in kidnapping is the point at which [a v]ictim's physical association with [a d]efendant was no longer voluntary"). Therefore, sufficient evidence was presented for the jury to conclude that both elements of the kidnapping instruction were met.

**{26}**     Unlike the aggravated battery, the underlying actions supporting Defendant's convictions for voluntary manslaughter and kidnapping were not sufficiently separated by time and space. We therefore rely on other indicia of distinctness to determine whether the jury could reasonably have inferred an independent factual basis for these two crimes. *Lopez*, 2008-NMCA-002, ¶ 16. Distinctness may be indicated by a number of factors, including that different types of force were used to commit each crime. *See State v. Stone*, 2008-NMCA-062, ¶ 22, 144 N.M. 78, 183 P.3d 963.

**{27}**     Here, evidence of Defendant's use of two different types of force to commit each crime constitutes a sufficient indication of distinctness to uphold Defendant's kidnapping conviction. The State presented evidence that after Defendant shot Victim and after some thought, Defendant kept Victim's unconscious body in the vehicle and drove him to the mesa. A jury could reasonably have inferred from this evidence that Defendant used two different types of force to commit voluntary manslaughter and kidnapping. The first, shooting Victim inside Defendant's vehicle, and the second, keeping the unconscious Victim in the vehicle and transporting him to the mesa. *See State v. Martinez*, 2006-NMSC-007, ¶ 47, 139 N.M. 152, 130 P.3d 731 (concluding that actions underlying the defendant's conviction for kidnapping, based on tying up the victim, and murder, based on stabbing her in the chest, were sufficiently distinct); *State v. Bernal*, 2006-NMSC-050, ¶¶ 12, 20-21, 140 N.M. 644, 146 P.3d 289 (upholding two attempted robbery convictions where the assailants

poked the victim with their guns and threatened her with violence, and shot and killed the other victim).

**{28}**    We conclude that the jury could reasonably have inferred an independent factual basis for all three of Defendant's convictions, and we do not second-guess the factual conclusions of a jury. *See State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (explaining that the appellate courts will not "invade the jury's province as fact-finder by second-guessing [its] decision" (alteration omitted) (internal quotation marks and citation omitted)).    We therefore hold that Defendant's convictions for aggravated battery, kidnapping, and voluntary manslaughter were not based on unitary conduct and did not violate his right to be free from double jeopardy. *See Swafford*, 112 N.M. at 14, 810 P.2d at 1234 (stating that "similar statutory provisions sharing certain elements may support separate convictions and punishments where examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses").

**{29}**    With regard to Defendant's claim that his convictions for voluntary manslaughter, kidnapping, and aggravated battery were not supported by sufficient evidence, we note that this contention, although it is raised in a point heading, is not expounded on in subsequent paragraphs of his brief in chief.    While this Court's policy is to refrain from reviewing "unclear or undeveloped arguments which require us to guess at what parties' arguments might be[,]" we note that in this case, the facts sufficiently provide substantial evidence to support Defendant's convictions. *State v. Fuentes*, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181.

**Tampering with Evidence and Conspiracy**

**{30}**    Defendant claims that his convictions for tampering with evidence and conspiracy to tamper with evidence were based on cumulative errors that violated his constitutional rights of due process and freedom from double jeopardy.  Our review of double jeopardy claims is de novo. *State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737. Likewise, we conduct a de novo review of constitutional questions of due process. *State v. Calabaza*, 2011-NMCA-053, ¶ 9, 149 N.M. 612, 252 P.3d 836.

**{31}**    We first examine Defendant's claimed due process violation with regard to the two convictions of conspiracy to tamper with evidence.  Procedural due process "requires the [prosecution] to provide reasonable notice of charges against a person and a fair opportunity to defend." *State v. Dominguez*, 2008-NMCA-029, ¶ 5, 143 N.M. 549, 178 P.3d 834 (internal quotation marks and citation omitted).  It "also requires that criminal charges provide criminal defendants with the ability to protect themselves from double jeopardy." *Id.* (internal quotation marks and citation omitted).  In *Dominguez*, this Court affirmed the district court's dismissal of five counts against the defendant that "could not be tied to individual, factually distinguishable incidents of alleged misconduct." *Id.* ¶ 1.  Here, Defendant argues, and the State concedes, that the conspiracy to tamper with evidence charges violated Defendant's due process rights. *Cf. State v. Caldwell*, 2008-NMCA-049,

¶ 8, 143 N.M. 792, 182 P.3d 775 ("This Court . . . is not bound by the [prosecution's] concession[,] and we conduct our own analysis[.]").

{32}   The jury instructions pertaining to the conspiracy charges required the State to prove that (1) Defendant and another person agreed to commit tampering with evidence; (2) Defendant and another person intended to commit tampering with evidence; and (3) this occurred on or about January 28, 2007 through February 19, 2007. Three identical instructions were given and each pertained to an identical charge against Defendant which read:

> . . . on or about or between the dates of January 28, 2007[,] through February 19, 2007, in Bernalillo County, New Mexico, [Defendant] and another person by words or acts agreed together to commit [tampering with evidence], and they intended to commit [tampering with evidence], contrary to [NMSA 1978, Section] 30-28-2 [(1979)] and [NMSA 1978, Section] 30-22-5 [(2003).]

{33}   Here, as in *Dominguez*, "[n]othing in the indictment [or in the jury instructions] provided any information that would distinguish one count from any other count." 2008-NMCA-029, ¶ 2. Because the counts were not tied to particular actions or offenses, the conspiracy for tampering with evidence charges provided Defendant "with little ability to defend himself" and rendered impossible the jury's task of concluding that Defendant was guilty of some of the offenses but not others. *Id.* ¶ 8 (internal quotation marks and citation omitted). Therefore, because the State failed "either [to] charge ongoing conduct as a single offense or [to] charge [Defendant] with and provide evidence of distinct offenses that [would] support multiple counts[,]" we reverse Defendant's conspiracy to tamper with evidence convictions as they constituted a violation of procedural due process. *Id.* ¶ 11.

{34}   Defendant's three convictions for tampering with evidence, on the other hand, were supported by sufficient indicia of distinctness and were supported by sufficient evidence. Defendant relies on *State v. Saiz*, 2008-NMSC-048, ¶ 38, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v Belanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783; and he relies on *State v. DeGraff*, 2006-NMSC-011, ¶ 34, 139 N.M. 211, 131 P.3d 61, for the proposition that "imposing multiple punishments for tampering charges directed at the same item of evidence," which in this case he asserts was the Lincoln, violates the unit of prosecution principles articulated in those cases. We are not persuaded.

{35}   In *Saiz*, the defendant was convicted of nine counts of tampering with evidence based on his attempts to clean the scene of his crime, dispose of the body of his victim, and clean his clothing the day after the crime. 2008-NMSC-048, ¶¶ 36, 41. Our Supreme Court determined that "[w]hile [the d]efendant performed dozens of individual physical acts in disposing of and altering a great number of evidentiary items, there were really only three conceptually separate crimes of tampering[.]" *Id.* ¶ 41. The first occurred at the scene of the crime when the defendant cleaned and painted various items immediately after the crime; the second when the defendant disposed of the victim's body in another town; and the third when he attempted to clean his clothes the next day at his home. *Id.* ¶¶ 36, 41. Similarly,

in *DeGraff*, the defendant was convicted of five counts of tampering with evidence. 2006-NMSC-011, ¶ 1. Three of the defendant's convictions were based on the act of disposing of a single box containing three pieces of evidence. *Id.* ¶¶ 32, 36-37. Our Supreme Court concluded that disposing of the box constituted a single act of tampering and dismissed two of the defendant's five tampering convictions. *Id.* ¶¶ 37-39.

**{36}** Here, unlike *Saiz* or *DeGraff*, Defendant's separate tampering charges and convictions with regard to the Lincoln were based on distinct acts, separated by time and space. *See Quick*, 2009-NMSC-015, ¶ 25 (stating that "[d]istinctness may be established by determining whether the acts constituting the two offenses [were] . . . separated by time or space" (internal quotation marks and citation omitted)). Whereas Count 11 was related to Defendant's act of giving away the Lincoln in which Victim had been shot, Count 13 charged Defendant with having regained possession, and then taking it away and setting fire to it. And unlike the defendants in *Saiz* and *DeGraff*, whose convictions were reversed based on the fact that their acts of tampering were committed in a single location and within the same time frame, here, Defendant committed two distinct acts of tampering when he first gave away the vehicle, and subsequently, at a different time and place, when he regained possession of and set fire to the vehicle. Thus, the two latter tampering convictions related to the vehicle did not constitute a violation of Defendant's constitutional rights.

**{37}** Nor are we persuaded by Defendant's argument that the tampering charges were not supported by sufficient evidence. In support of his insufficient evidence argument Defendant cites *State v. Silva*, 2008-NMSC-051, ¶¶ 19-20, 144 N.M. 815, 192 P.3d 1192, and *State v. Duran*, 2006-NMSC-035, ¶¶ 15-16, 140 N.M. 94, 140 P.3d 515. Neither case supports Defendant's position. In *Silva*, the prosecution failed to present "any evidence, circumstantial or otherwise, of an overt act" by the defendant from which the jury could infer an intent to disrupt the police investigation. 2008-NMSC-051, ¶ 19. Similarly, in *Duran*, there was no evidence of any act by the defendant to destroy or hide evidence, with the only support for the tampering charge stemming from the fact that the evidence was not found. 2006-NMSC-035, ¶ 15. Here, on the other hand, the State presented evidence of Defendant's intent to disrupt the police investigation by first giving away the vehicle and then by retrieving it and intentionally setting fire to its interior.

**{38}** Neal's testimony supported an inference that Defendant gave away the vehicle and that he later regained possession of the vehicle and intentionally set fire to it in order to interfere with the police investigation. In addition to Neal's testimony, the State presented evidence that the car had intentionally been burned in a fire that likely started in the back seat and that the back seat revealed a bullet hole. The State also presented a witness who saw a "young man" with a sprite bottle near the vehicle moments before it was on fire. Therefore, here, unlike *Silva* and *Duran*, the State presented evidence to support a verdict of guilty on the tampering with evidence charges. Viewing the evidence in the light most favorable to the jury's verdict, we hold that the evidence presented was sufficient to support the convictions. *See State v. Gallegos*, 2011-NMSC-027, ¶ 15, 149 N.M. 704, 254 P.3d 655 (stating that in addition to viewing the evidence in the light most favorable to the prevailing party, the appellate courts also resolve all conflicts and indulge all permissible inferences in favor of the verdict).

9

**{39}**     Finally, with regard to the tampering with evidence convictions, Defendant argues that reversible error occurred when the district court allowed the indictment to be amended after the State rested its case. We review de novo whether the district court properly allowed amendment of the indictment. *State v. Roman*, 1998-NMCA-132, ¶¶ 8-9, 125 N.M. 688, 964 P.2d 852.

**{40}**     The original indictment charged Defendant with four counts of tampering with evidence. While the specific acts of tampering varied as to each charge, all four charges alleged that Defendant had committed tampering "with intent to prevent the apprehension, prosecution[,] or conviction of [Jose Sullivan]." Sullivan, who allegedly was present when Victim was killed and was involved in the related crimes, was not involved with Defendant's trial. At the close of the State's case, among the various motions made by Defendant's counsel was a motion to dismiss all counts of tampering with evidence based on the lack of evidence presented that the acts were done "in order to prevent Jose Sullivan from being caught." The State argued that there had been a clerical error and requested, under Rule 5-204 NMRA, that the indictment be amended to reflect Defendant's name in place of Jose Sullivan. The district court found that the amendment was appropriate under Rule 5-204(A) and (C) and would not be prejudicial to Defendant. The jury was instructed accordingly.

**{41}**     While Defendant argues on appeal that all of the tampering charges should be dismissed because, among other reasons, Defendant was "deprived . . . of sufficient notice and opportunity to present an adequate and effective defense[,]" he did not make this argument below. Nor on appeal does he present a persuasive argument to indicate in what way he was prejudiced by the amendment. "The mere assertion of prejudice, without more, is insufficient to establish prejudicial error warranting reversal of a conviction." *State v. Marquez*, 1998-NMCA-010, ¶ 20, 124 N.M. 409, 951 P.2d 1070 (internal quotation marks and citation omitted).

**{42}**     Moreover, as the district court noted at trial, everyone had "been working under the assumption that . . . [the charge] was directed to [Defendant.]" And as this Court has previously held, "[a] variance is not fatal unless the accused cannot reasonably anticipate from the indictment what the nature of the proof against him will be." *Id.* We see no basis for reversal of the tampering with evidence convictions. As to Defendant's claim of cumulative error with regard to the tampering convictions, having rejected Defendant's assertions of error, we conclude that the doctrine of cumulative error does not apply. *See State v. Quinones*, 2011-NMCA-018, ¶ 41, 149 N.M. 294, 248 P.3d 336 (explaining that where there is no error, there is no cumulative error).

**Gang Affiliation and Threats Against Witnesses**

**{43}**     Defendant's final claim on appeal is that he was prejudiced by the district court's admission at trial of "evidence of gang affiliation and threats against witnesses." We review the district court's admission of evidence under an abuse of discretion standard. *Id.* ¶ 19. Unless the district court's ruling on a matter was "clearly untenable or not justified by reason[,]" we cannot say it was an abuse of discretion. *Id.* (internal quotation marks and citation omitted).

**{44}** Prior to trial, the parties agreed and the district court ruled that, for the limited purpose of identity (i.e., nicknames), evidence of gang membership would be permitted. At trial, neither Rubio nor Neal testified as to Defendant's gang membership. It was only through Defendant's own testimony on cross-examination that the jury learned that Defendant, like Neal and Rubio, was from the "South Side" gang. Insofar as Defendant agreed prior to trial that gang nicknames were admissible for purposes of identity and insofar as he provided the only affirmative evidence of his own gang membership, we see no basis for his claim. *See State v. Handa*, 120 N.M. 38, 45-46, 897 P.2d 225, 232-33 (Ct. App. 1995) (stating that a defendant may not invite error and later complain about it); *State v. Padilla*, 104 N.M. 446, 450, 722 P.2d 697, 701 (Ct. App. 1986) (stating that a defendant may not "urge his own action as a ground for reversing his conviction" (internal quotation marks and citation omitted)). As invited error provides no grounds for appeal, we reject Defendant's argument regarding the prejudicial nature of gang affiliation evidence.

**{45}** Defendant also contends that he was prejudiced by evidence of threats made toward witnesses. The record reflects that the only evidence presented regarding threats toward any witness was Rubio's trial testimony. While Rubio related incidents of threats against him and his family pending his testimony in this matter, it was clear, as acknowledged by Defendant's counsel, that none of the threats were made by Defendant. Furthermore, although Defendant's counsel objected at trial to any discussion of threats that had been made, the objection was a broad one, in which counsel, without any specificity claimed that the testimony was "just prejudicial[.]" Notably, notwithstanding the State's argument as to why Rubio's testimony about the threats was relevant, Defendant's counsel did not make an argument regarding why the prejudicial nature of the testimony outweighed its prejudice. *See* Rule 11-403 NMRA (reading, in part, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

**{46}** It is well established that in order to preserve an argument for appeal, an objection "must be made with sufficient specificity to alert the mind of the trial court to the claimed error[.]" *State v. Riley*, 2010-NMSC-005, ¶ 24, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). While Defendant argues in this Court that testimony regarding the threats "encouraged the jury to draw the inference that [Defendant] was a gang member with a propensity to engage in violent criminal behavior and, more particularly, that he and the gang with whom he allegedly affiliated were somehow responsible for threatening the State's two informants[,]" this argument was not raised below with "sufficient specificity [so as] to alert the mind of the trial court to the claimed error." *Id.* We will not consider arguments not properly preserved in the district court, and we therefore decline further examination of this issue. *See Quinones*, 2011-NMCA-018, ¶¶ 25-26. We hold that the district court did not abuse its discretion in admitting testimony related to gang affiliation or threats to witnesses.

**CONCLUSION**

**{47}** We affirm the district court as to Defendant's convictions for voluntary manslaughter, aggravated battery, kidnapping, and tampering with evidence. We reverse

11

Defendant's convictions of conspiracy to tamper with evidence. We remand to the district court for proper adjustment to Defendant's sentence in accordance with this Opinion.

**{48} IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *State v. Urioste*, No. 30,110**

| **AE** | **APPEAL AND ERROR** |
|---|---|
| AE-PJ | Prejudicial Error |
| AE-SR | Standard of Review |
| AE-SB | Substantial or Sufficient Evidence |

| **CT** | **CONSTITUTIONAL LAW** |
|---|---|
| CT-DJ | Double Jeopardy |
| CT-DP | Due Process |

| **CL** | **CRIMINAL LAW** |
|---|---|
| CL-BA | Battery |
| CL-CS | Conspiracy |
| CL-HO | Homicide |
| CL-KP | Kidnaping |
| CL-TM | Tampering |
| CL-TE | Tampering with Evidence |

| **CA** | **CRIMINAL PROCEDURE** |
|---|---|
| CA-DJ | Double Jeopardy |
| CA-DU | Due Process |
| CA-NO | Notice |